**SONCO STEEL TUBE DIV., FERRUM, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Lone Star Steel Co., Defendant–Intervenor.**

**Court No. 86–07–00899.**

United States Court of International Trade.

Aug. 18, 1988.

---

Dow, Lohnes & Albertson, William Silverman, Carrie A. Simon and Douglas J. Heffner, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Dewey, Ballantine, Bushby, Palmer & Wood, Michael H. Stein, Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff, Sonco Steel Tube Division, Ferrum, Inc. (Sonco), contests a final determination by the United States Department of Commerce, International Trade Administration (ITA) that oil country tubular goods

(OCTG)[1] from Canada are being sold in the United States at less than fair value. *Oil Country Tubular Goods from Canada*, 51 Fed.Reg. 15,029 (Apr. 22, 1986), as amended, *Oil Country Tubular Goods (OCTG) from Canada*, 51 Fed.Reg. 29,579 (Aug. 19, 1986). Before the court is plaintiff's motion for judgment upon the agency record, pursuant to Rule 56.1 of the rules of this court. Defendant, United States, opposes plaintiff's motion and seeks affirmance of the administrative determination under challenge.

## BACKGROUND

A petition was filed with ITA in July 1985 on behalf of the domestic OCTG industry alleging that imports of OCTG from Canada were being, or were likely to be, sold in the United States at less than fair value, and that these imports were materially injurious, or threatening to injure, an industry in the United States. *See* 19 U.S. C. § 1673 (1982 & Supp. IV 1986). ITA published notice of its determination to initiate an investigation in August. *Oil Country Tubular Goods from Canada*, 50 Fed.Reg. 33,387 (Aug. 19, 1985).

ITA sent questionnaires to four Canadian OCTG producers under investigation, including Sonco. After examining the responses of the Canadian companies, ITA issued its preliminary determination that imports of OCTG from Canada were being sold at less than fair value in the United States, and that Sonco's imports were being dumped at a margin of 0.82 percent. *Oil Country Tubular Goods from Canada*, 51 Fed.Reg. 660, 662 (Jan. 7, 1986).

ITA published its final affirmative antidumping duty determination in April 1986, finding Sonco to have sold OCTG in the United States at a weighted average dumping margin of 3.35 percent during the period of investigation. 51 Fed.Reg. at 15,036. After the United States International Trade Commission issued its final determination of material injury, ITA published an anti-

---

**1.** OCTG are hollow steel products of circular cross-section intended for use in drilling for oil or gas. 51 Fed.Reg. at 15,030.

dumping order requiring the cash deposit of estimated antidumping duties, on all entries of OCTG from Canada at the rates set at ITA's final less than fair value determination. *Oil Country Tubular Goods (OCTG) from Canada*, 51 Fed.Reg. 21,782 (Jun. 16, 1986).

In response to complaints that certain errors had been made in ITA's final determination, ITA amended both its June 16 antidumping order and the underlying final determination to increase plaintiff's weighted average dumping margin from 3.35 percent to 3.48 percent. 51 Fed.Reg. 29,579.

## ARGUMENTS

Under the Tariff Act of 1930, as amended, dumping margins are measured by calculating the amount by which foreign market value exceeds the United States price of imported merchandise. 19 U.S.C. § 1673 (1982 & Supp. IV 1986). The methods by which foreign market value and United States price are determined are specifically provided for in the Act. 19 U.S.C. §§ 1677a–1677b (1982 & Supp. IV 1986). In the present action, plaintiff contends that ITA made several errors in determining and adjusting the foreign market value and United States price of the subject OCTG. Plaintiffs also alleges that ITA acted improperly when it amended its final determination to increase Sonco's dumping margin. Specifically plaintiff claims that:

(1) ITA's decision to treat limited service OCTG as a fully costed product, rather than as a by-product, in its calculation of constructed value is contrary to ITA precedent and produces an unreasonable result that is contrary to the intent of the antidumping law.

(2) ITA acted contrary to law by including in its fair value comparison U.S. sales that were made out of the ordinary course of trade.

(3) ITA erred by failing to adjust foreign market value for differences in early payment discounts provided to Sonco's U.S. and home market customers.

(4) ITA erred by amending its final determination to change policies.

(5) ITA's rule concerning the deduction from Exporters Sales Price (ESP) of the profit attributable to further processed ESP sales is invalid because it was not promulgated in accordance with the notice and comment procedures of the Administrative Procedure Act (APA).

(6) ITA's amended final determination and antidumping duty order failed to correct certain clerical errors in the final determination that inflate Sonco's dumping margin.

## DISCUSSION

### I. ITA's Treatment of Limited Service OCTG

■ Plaintiff's first argument is essentially identical to that made by IPSCO, Inc., another Canadian producer of OCTG subject to this same investigation, in its challenge of ITA's final determination. That challenge was recently addressed by the court in *IPSCO, Inc. v. United States*, 687 F.Supp. 633, 635–38 (C.I.T.1988). The court's extensive discussion of this issue need not be repeated here.

In summary, the court concluded that it is unable to discern from the determination what standard ITA is applying in making the co-product/by-product distinction and, if it differs from former agency or generally accepted accounting principle standards, why it is being applied. The court reasoned that it first must be able to discern if the criteria which are applied are reasonable before it can determine if the defendant has relied on substantial evidence. In this case, as in *IPSCO*, this matter is remanded to ITA for reconsideration and a fuller explanation of the basis for whatever by-product/co-product choice it makes.

### II. U.S. Sales "Not Made in the Ordinary Course of Trade"

■ Plaintiff contends in this case, as in *IPSCO*, that ITA acted in a manner contrary to law by including in its fair value comparison certain U.S. sales which it believes were made "out of the ordinary course of trade." According to plaintiff, the transactions at issue involved "short

ends of non-API limited service pipe that resulted from Sonco's conversion of steel coils (also known as 'skelp') for one of its conversion customers." Plaintiff's Brief at 34. Plaintiff's challenge ITA's decision to include this merchandise in the fair value comparison once it had verified that this merchandise did not belong to Sonco and that Sonco had disposed of it only after the customer refused to claim it. *Id.* (citing Confidential Record Document Number (CR) 61, at 2015A).

In support of its position, plaintiff argues that: (1) legislative history and ITA policy require ITA to compare only those sales that are made in the ordinary course of trade, and (2) ITA's own precedent requires that ITA exclude from its fair value comparison U.S. sales that are not made in the ordinary course of trade.

In *IPSCO*, the court rejected plaintiffs' argument that the statutory scheme required the administering authority to exclude all sales made out of the ordinary course of trade from its determination of U.S. price. For the same reasons, the court rejects plaintiff's similar arguments here. Nonetheless, this issue was remanded to ITA because the court was uncertain as to whether the agency actually asserts that it *must* include all U.S. sales in its fair value comparison, whether or not they are made in the ordinary course of trade, and without regard to representativeness, fairness of the comparison or the purpose of the act, or whether ITA asserts that it exercised discretion in this area, but decided that the particular sales at issue must be included for some sound reason.[2]

As in *IPSCO*, defendant did not address its practices in other cases or its statements of policy. If, as ITA's precedent indicates, it has some discretion to exclude certain limited sales that are unrepresentative of respondent's practices in the U.S. market, the sale of this particular merchandise would seem to be eligible for exclusion. Inasmuch as ITA has provided little explanation for its inclusion of this sale, and because defendant's arguments to this court conflict with ITA's past precedent, ITA is directed to reconsider this portion of its determination, and to provide a full explanation for its decision.

### III. Early Payment Discounts

■ Plaintiff next challenges ITA's treatment of early payment discounts provided to Sonco's U.S. and home market customers. According to information submitted by plaintiff, Sales Verification Record Document Number 3, at 140–171, which was subsequently verified by ITA, CR 61, at 2014A, Sonco provides certain discounts to its U.S. customers if the customers pay for merchandise shortly after delivery. Plaintiff maintains that, although Sonco had no home market sales of OCTG during the period of investigation, Sonco offers a similar early payment discount on home market sales of the "same general class of merchandise as OCTG." Plaintiff believes ITA should have treated the discounts as circumstances of sale and adjusted foreign market value to arrive at a fair comparison. Plaintiff's Brief at 40. Defendant acknowledges that Sonco offers a discount to all of its customers, both foreign and domestic. Defendant's Brief at 20 n. 22.

---

**2.** Plaintiff argues that it was inappropriate for ITA to assign a constructed value to the conversion customer's merchandise which it sold because Sonco was fully paid for its conversion services and incurred no cost in its production. One domestic interested party agrees with plaintiff that "these sales are out of the ordinary course of trade and should be disregarded for the purposes of the fair value determination." CR 35, at 19A, Comments on Sonco's Questionnaire Response on Behalf of the Oil Country Tubular Goods Subcommittee, The Committee on Pipe and Tube Imports and its Individual Member Producers. While the court agrees with ITA that the scope of this investigation was

not limited by the manufacturer of the merchandise, Public Amended Record Document Number (Amend. PR) 14, at 88, the court notes that excluding this type of sale from the fair value comparison may be consistent with at least one recent ITA determination, post-dating the final determination in this case, *Fabric and Expanded Neoprene Laminate from Taiwan,* 52 Fed.Reg. 37,193 (Oct. 5, 1987). In that determination, the agency excluded certain U.S. sales from its fair value comparison after concluding that, "the unusual circumstances surrounding these sales indicate that they are not representative of respondent's selling practices in the U.S. market." *Id.* at 37,194.

During the course of the investigation, plaintiff requested that ITA treat differences in early payment discounts as well as differences in credit expenses in the respective markets as circumstances of sale adjustments to foreign market value pursuant to the statute, 19 U.S.C. § 1677b(a)(4)(B) (1982) and ITA regulations, 19 C.F.R. § 353.15(a) (1987). In its final determination, ITA adjusted foreign market value for differences in credit expenses but rejected plaintiff's argument that early payment discounts are properly treated as circumstances of sale warranting an adjustment. Instead, ITA treated Sonco's discounts in the U.S. market as reductions in U.S. price, and made no adjustment to foreign market value. Explaining its position, ITA stated that:

> A reduction for an early payment discount from the price has been a longstanding administrative practice. A discount represents a reduction in the price paid by the customer and must be deducted in calculating U.S price. It is not a circumstance of sale adjustment.

51 Fed.Reg. at 15,033.[3]

While Congress has given ITA broad discretion to determine whether a factor or condition of sale warrants an adjustment in foreign market value for circumstances of sale, *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 528, 622 F.Supp. 1071, 1078 (1985), that discretion must be exercised reasonably and in a non-arbitrary manner. In this case, ITA refused to allow a circumstances of sale adjustment apparently basing its decision on what it refers to as the "longstanding administrative practice" of treating discounts as reductions in price. Defendant has cited numerous recent ITA determinations in which the agency has acted in accordance with such practice. *See* Defendant's Brief at 24 n. 26. As recently as March 1986, however, ITA permitted an adjustment to foreign market value based on constructed value for early payment discounts. *Tool Steel from the Federal Republic of Germany,*

51 Fed.Reg. 10,071 (Mar. 24, 1986) (Correction to Early Determination of Antidumping Duty). In that determination, ITA stated, "[w]e have made adjustments to constructed value, where applicable, for early payment discounts." *Id.*

Citing *Tool Steel*, plaintiff argues that ITA's refusal to treat early payment discounts as a circumstances of sale adjustment in this case, is contrary to agency precedent. Plaintiff's Brief at 42. Acknowledging the *Tool Steel* determination, defendant responds that "although the agency has authority to treat discounts as circumstances of sales adjustments and has done so in the past, it generally considers discounts as a reduction in United States price." Defendant's Brief at 23 (footnote omitted).

As the court sees it, *Tool Steel* may stand for either one of two propositions. First, as defendant states in its brief, it may mean that ITA treats early payment discounts as circumstances of sale adjustments in certain situations, while treating them as reductions in price in others. Second, the adjustment made in *Tool Steel* may not have been a circumstances of sale adjustment at all, but rather some other type of factor used in calculating constructed value.

The first *Tool Steel* scenario presents the court with problems stemming from the fundamental difference between a policy which treats discounts as circumstances of sale adjustments and one which treats discounts as reductions in price in the respective markets. According to the statute, a circumstances of sale adjustment allows the administering authority, ITA, to make "due allowance" for differences in circumstances of sales in the two markets being compared. 19 U.S.C. § 1677b(a)(4)(B) (1982). It is intended to address and correct situations in which a difference (or a lack of a difference) between United States price and foreign market value is "wholly or partly due to ... differences in circum-

---

**3.** ITA also rejected plaintiff's suggestion that the discount be treated as an offset to credit expenses for the same reason. 51 Fed.Reg. at 15,003. *See* Plaintiff's Brief at 43–44. As indi-

cated, *infra,* the court cannot conclude that the agency has acted reasonably on the basis of this brief explanation. A fuller explanation is required.

stances of sale." *Id.* Thus, in the present case, if it was established to the satisfaction of ITA that early payment discounts should be treated as circumstances of sale adjustments, ITA would determine the difference in discounts given in the respective markets and make an adjustment to foreign market value which would essentially factor this difference out of the fair value comparison.

An adjustment which factors such differences out of the fair value comparison is entirely different from a policy which merely treats discounts as reductions in price on both sides of the comparison. Under this latter policy, differences in discounts given in each market would be reflected in the fair value comparison—not factored out.

Thus, if *Tool Steel* does stand for the proposition that ITA may, sometimes, treat discounts as circumstances of sale adjustments, but such treatment is not appropriate here, ITA must explain why. No such explanation has been provided here. ITA's only statement on the issue, that a "reduction for an early payment discount from the price has been a longstanding administrative practice" does not suffice. Without further explanation of the reasons supporting the agency's decision, the court cannot conclude that the agency has acted reasonably simply because it has utilized a methodology here which it has utilized previously more times than not.

Furthermore, if there is a valid distinction to be made among types of cases and if this is the type of case in which the adjustment for circumstances of sale may be made, the agency must explain why such an adjustment was denied in this case.

In doing so, the court recognizes that the burden of demonstrating entitlement to a circumstances of sale adjustment is on the party requesting the adjustment.[4] While it is entirely possible that plaintiff has not satisfied this burden in this case, this is not apparent from the administrative record or ITA's final determination.[5,6]

It is also possible that the adjustment referred to in *Tool Steel* was not a circumstances of sale adjustment, but rather some other type of adjustment to constructed foreign market value, roughly equivalent to a reduction in price which would have been made had the agency established the existence of such discounts in the home market and based foreign market value on home market sales. Previous ITA determinations indicate that the agency does make reductions to home market price for early payment discounts when foreign market value is based on home market sales. *See, e.g., Industrial Phosphoric Acid from Belgium,* 52 Fed.Reg. 25,436, 25,437 (Jul. 7, 1987). Under this theory, *Tool Steel* may stand for the proposition that ITA may account for early payment discounts when applicable in the home market, even if foreign market value is based on constructed value. Such a policy would appear consistent with this court's previous statement that "constructed value is merely a proxy for price-based value, used by the agency when price-based value is not available." *Timken Co. v. United States,* 673 F.Supp. 495, 508 (1987). Thus, if it is ITA's policy to calculate constructed value in a manner which reflects early payment discounts in the home market, ITA must

---

**4.** The statute requires an adjustment to foreign market value only *"if it is established to the satisfaction of the administering authority* that the amount of any difference between United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to ... other differences in circumstances of sales" 19 U.S.C. § 1677b(a)(4) (emphasis added).

**5.** Defendant does argue in its brief that ITA disallowed the claimed adjustment because it was unable to verify actual costs incurred in the implementation of the program. It is not ap-

parent from the record, and defendant has made no citations to the record, which indicate that this was ITA's reasoning.

**6.** It .should be noted that in calculating credit terms between markets, for which ITA allowed a circumstance of sale adjustment, ITA compared Sonco's U.S. sales of OCTG with its Canadian sales of standard pipe, water well casing and line pipe, none of which are OCTG products subject to this investigation. CR 61, at 2014. Plaintiff requests similar treatment for their early payment discounts. Plaintiff's Brief at 43 n. 9. It does not appear from the record that ITA attempted any such comparison.

explain why such an adjustment was not made here.

In summary, ITA should clarify whether it is agency policy to account for differing early payment discounts in the respective markets using a circumstances of sale adjustment, and if so under what circumstances. If a circumstances of sale adjustment could have been made here, ITA should indicate why plaintiff has not demonstrated entitlement to such an adjustment. If it is not agency policy to make circumstances of sale adjustments for early payment discounts, ITA must explain why it has made no other adjustment to constructed value. In either event, a complete explanation of the relevant portion of *Tool Steel* should be provided.

### IV. The Amended Determination

Plaintiff next challenges two aspects of ITA's amended final determination. In announcing its action, ITA explained these particular changes were "based on the Department's current methodology at the time of the final determination in this case." Amend. PR 26, at 288. Plaintiff disputes this characterization and claims that the changes were improper because they were the result of policy changes at ITA.

As a preliminary matter, the court notes that

It is now well established that amendment, before or after remand, is appropriate when the agency has utilized a legally improper method in making a determination or when the original determination contains an error of inadvertence or mistake.

*Badger–Powhatan, a Div. of Figgie Int'l. v. United States*, 633 F.Supp. 1364, 1368 (1986). Previously, the court had defined the scope of "error of inadvertence or mistake" to include overlooking the agency's

own "precedent in a situation in which it appears clearly applicable, although the precedent resulted from discretionary considerations...." *Melamine Chemicals, Inc. v. United States*, 8 CIT 105, 107, 592 F.Supp. 1338, 1341 (1984). In *Melamine*, ITA initially made a final determination that sales of melamine from the Netherlands were being sold at less than fair value. ITA then determined that it had not properly applied its regulation concerning calculation of exchange rates during periods of rate fluctuation in its original determination and amended its decision to find no less than fair value sales. The court upheld this amendment noting that ITA was attempting to apply existing policy and precedent rather than changing policy. 8 CIT at 107, 592 F.Supp. at 1340–41.

■ Plaintiff's first challenge is based upon its allegation that ITA "substituted the actual interest expense that it verified and used in the final determination with an 'interest expense apportioned to accounts receivable.'" Plaintiff's Brief at 50 (*citing* Amend. PR 26, at 288). The quoted language which plaintiff relies upon comes from an ITA memorandum which states that "home market credit expenses, as reported in the sales listing, have been *substituted for* the interest expense apportioned to accounts receivable." Amend. PR 26, at 288 (emphasis added). Plaintiff's allegation is at odds with the plain meaning of the ITA statement upon which it relies.[7] Plaintiff has failed to demonstrate that ITA undertook the actions which it alleges and challenges. Accordingly, the court finds no basis for this particular claim.[8]

■ Next, plaintiff raises several challenges concerning ITA's deduction of profit associated with further processing in the United States from exporters sales price (ESP)[9] in its amended determination. *See*

---

**7.** Initially, when plaintiff cited this statement in its complaint, it inserted an editorial *sic* after the words "substituted for." Plaintiff's First Amended Complaint at ¶ 72.

**8.** Neither the *citations and arguments* provided by the parties, nor the court's own review of the record, has enabled the court to determine that

ITA took the specific actions that plaintiff alleges and challenges.

**9.** When merchandise is sold to an unrelated purchaser after its importation into the United States, ITA determines United States price using exporters sales price as defined at 19 U.S.C. § 1677a(c) (1982). In this case, OCTG was imported into the U.S., subjected to further pro-

Amend. PR 26, at 288.[10] Plaintiff argues that ITA's methodology in this case is contrary to the statute and ITA's regulations, that it was improper for ITA to introduce that methodology into this case at the amended determination, and that ITA could not use that methodology until it had subjected it to formal notice and comment rulemaking procedures. Defendant maintains that the deduction of profit on value added in the United States was consistent with the statute, ITA regulations, and agency practice at the time of the original determination. Defendant further responds that it was merely correcting an error it had made in the original determination, and that it was not required to go through formal rulemaking procedures before considering profit in ESP adjustments for value added in the United States.

Plaintiff cites the statute, ITA's regulations, and the promulgation history of those regulations in support of its position that ITA could not, and did not, have a policy providing for consideration of profit as an element of ESP adjustments for value added in the United States.

Neither the statute nor the regulation specifically addresses the issue of profit as an ESP deduction where value has been added in the United States. The statute merely provides for an ESP deduction for:

any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

19 U.S.C. § 1677a(e)(3) (1982). The language of ITA's regulation implementing this statute is essentially identical, adding only that "value generally will be determined from the costs of material, labor and other expenses incurred in such manufacture or assembly." 19 C.F.R. § 353.10(e)(3) (1987). The plain words of the statute and regulation neither expressly prohibit nor require ITA to consider profit as an element of value added.

Although ITA did reject a specific proposed regulation regarding ESP value added adjustments for profit, it acknowledged the existence of a policy permitting some adjustments, and announced its desire to gain further experience with such adjustments before adopting any specific proposals.[11] While formal rulemaking procedures might be required before ITA could adopt the specific type of rule which ITA rejected in 1980, it is not precluded from construing the statute to cover profit as a factor in value added and making ESP adjust-

---

cessing (threading and coupling) by a related firm, and then sold to unrelated purchasers. The particular deduction for profit made in this case was for profit associated with value added in the United States, rather than for other forms of profit that might be associated with sales in the United States. *See Timken Co. v. United States,* 630 F.Supp. 1327 (1986) (governed by the Antidumping Act of 1921) 673 F.Supp. 495 (1987) (governed by current law) (finding that ITA was not required to interpret the statutory ESP deduction for "commissions" to include deductions for profits as well).

**10.** ITA stated that "U.S. manufacturing cost has been adjusted by the profit or loss on each sale, with profit allocated proportionally to the cost elements including U.S. manufacturing costs." *Id.*

**11.** Initially, the Treasury Department, which administered the antidumping law before ITA, proposed what it described as a provision that "reflects recently adopted practice by providing

that if the value of merchandise when imported is less than 80% of the price when sold to a party unrelated to the exporter, an allocation of profit attributable to the addition of post-importation material, labor or services shall be included in the adjustments made. Proposed Revision of the Customs Regulations Relating to Antidumping Duties, 44 Fed.Reg. 59,742, 59,744, 59,-749 (Oct. 16, 1979) (Treasury's proposed revision of 19 CFR § 153.10(e)(3)). ITA acknowledged that "[t]he proposal reflected, in part, past practice," which had never been incorporated into Treasury's Regulations. Antidumping Duties, 45 Fed.Reg. 8,182, 8,184, (Feb. 6, 1980) (ITA's adoption of 19 CFR § 353.10(e)(3)). In response to comments which "criticized the '80 percent rule' as arbitrary and contrary to commercial considerations governing profits," *id.,* ITA decided to defer this, and other, provisions to permit further study, explaining that "the Department prefers to gain more experience with them prior to publishing final regulations." *Id.* at 8,182.

ments.[12] *See Carlisle Tire & Rubber Co. v. United States,* 634 F.Supp. 419, 423 (1986); *Ipsco, Inc. v. United States,* 687 F.Supp. 614, 626–31 (May 4, 1988).

Although defendant asserts that ITA actually did have a policy of making ESP value added adjustments for profit, it cites only determinations or statements which post-date the final determination in this case. *See Brass Sheet and Strip From the Federal Republic of Germany,* 52 Fed. Reg. 822, 823 (Jan. 9, 1987); *Erasable Programmable Read Only Memories (EP-ROMS) From Japan,* 51 Fed.Reg. 39,680 39,681 (Oct. 30, 1986). A statement by ITA on this issue, which pre-dates the final determination in this case, does exist, however.

In explaining its methodology to Congress, ITA stated in 1985 that the purpose of ESP adjustments for value added is to enable ITA to arrive at "the determination of the appropriate ESP for the merchandise in its condition at the time of importation." Department of Commerce, Study of Anti-dumping Adjustments Methodology and Recommendations for Statutory Change 34–35 (Nov. 1985). It went on to provide the following example of the scope of such an adjustment:

> In *Cellular Mobile Telephones and Subassemblies from Japan* (50 FR 45447, 10/31/85), we based the ESP of certain subassemblies on the selling price of finished CMTs and deducted the value

added, including general expenses and profit. We did this because there were no sales of subassemblies to unrelated purchasers in the U.S.

*Id.* at 35.[13] Given these official statements of policy to Congress, the determination cited therein, and statements made during the promulgation of ITA's initial regulations, the court finds no reason to dispute ITA's statement in this case that its treatment of profit associated with value added in the United States was "based on the Department's current methodology at the time of the final determination in this case." Amend. PR 26, at 288. Thus, ITA is allowed to amend its determination to conform to existing policy and practice.[14]

### V. ITA's Correction of Clerical Errors

Plaintiff finally claims that ITA's final determination and amended final determination contain three clerical errors which inflate Sonco's dumping margin. Specifically, plaintiff claims that (1) ITA double counted Sonco's scrap costs, (2) ITA double counted certain of Sonco's shipping labor costs and (3) ITA miscalculated Sonco's home market credit expenses in the amended final determination.

### (1) Double Counting of Scrap Costs

Plaintiff claims that by allocating an amount for total scrap costs to both prime and secondary (limited service) products, ITA has double counted the actual scrap

---

**12.** Plaintiff makes much of ITA's language that "it was determined to defer this provision to permit further study." 45 Fed.Reg. at 8,184. By deferring adoption of this and other provisions, ITA explained that it "prefers to gain more experience with them prior to publishing final regulations." 45 Fed.Reg. at 8,182. To argue that ITA may not proceed to consider profit generally, on a case by case basis, would deny ITA the opportunity to gain the requisite experience and study required to determine whether the adoption of a rule such as the 80% rule would be advisable.

**13.** In this case, with the exception of the sales claimed to be out of the ordinary course of trade, all of Sonco's sales of OCTG to unrelated purchasers in the U.S. involved pipe which had been threaded and coupled in the U.S.

**14.** Plaintiff makes two additional arguments concerning ITA's deduction of profit. First,

plaintiff argues that ITA used an arbitrary methodology for calculating profit. Specifically, plaintiff challenges ITA's use of imputed profit figures derived from U.S. manufacturing costs and U.S. prices. Plaintiff claims ITA should have instead used "actual" profit information which it could have verified. Plaintiff's Brief at 54 n. 10. The court finds that ITA's methodology, based on actual cost and price data, sufficiently reflects the company's actual experience and is reasonable.

Second, plaintiff argues that deducting profit attributable to further processing from E.S.P. may distort ITA's fair value comparison in certain factual situations not present in this case. *See* Plaintiff's Brief at 56–58. The court prefers to address any such distortion, if indeed it can be characterized as such, when those factual situations are before the court.

**968**

cost associated with Sonco's OCTG production thereby increasing Sonco's dumping margin.

As the question of whether ITA has properly allocated scrap costs between prime and limited service OCTG cannot be answered until the court has further examined the basis for ITA's decision to treat limited service OCTG as co-product and not as a by-product of prime, final resolution of this matter must await the results of the remand.[15]

**(2) Double Counting of Shipping Labor Costs**

Plaintiff claims that ITA double counted certain of Sonco's shipping labor costs by including these costs in both the overhead and direct labor portions of Sonco's cost of production in both the original and amended final determination. According to plaintiff, Sonco included certain shipping labor costs in its calculation of direct labor costs. In a subsequent submission to ITA, Sonco reclassified its shipping labor costs as packing costs. In the final determination, ITA disallowed this reallocation of costs and adjusted Sonco's submitted packing costs by subtracting from it the amount for shipping labor costs. ITA then added to the overhead portion of Sonco's manufacturing cost the amount for shipping labor costs. In its calculation of direct labor costs, however, ITA erroneously used Sonco's originally submitted direct labor costs, which included shipping labor costs. The effect of this error was the double counting of shipping labor costs in both overhead and direct labor costs.

Defendant does not dispute this chronology of events and admits that such a mis-

take was made in the original final determination, but argues that it was corrected in the amended determination. Plaintiff denies that any correction was made and asks the court to remand this issue unless defendant can show the court evidence of record indicating that this acknowledged error was, indeed, corrected.

Upon reviewing the record, the court concludes that this error has been corrected in the amended final determination. *See* Sonco/Benmit Cost of Production Verification Exhibit C24, at 524A, 530A and 539A.

**(3) Home Market Credit Expenses**

It is undisputed that in the original determination ITA erroneously concluded that Sonco's home market and U.S. credit expenses were the same, requiring no adjustment. Plaintiff argues that when ITA recalculated Sonco's home market credit expenses in the amended final determination, it calculated those expenses on the basis of an incorrect credit period contrary to one which had been verified by ITA, thereby inflating Sonco's dumping margin.[16] Plaintiff cites certain portions of an ITA computer printout, Confidential Amended Record Document Number (Amend. CR) 10, at 250A and 258A, in support of this claim. Defendant, citing the same computer printout at 250A and Sonco/Benmit Cost of Production Verification Exhibit C24, at 537A argues that the record demonstrates that ITA utilized the correct credit period in its calculations.

After a thorough examination of the record, it appears that ITA used the verified credit period, rather than the incorrect

---

**15.** In addition, there appears to be considerable confusion among the parties as to exactly how ITA has allocated scrap costs to prime and limited service OCTG. Plaintiff seems to believe that ITA allocated to the prime product a total scrap cost based on data submitted by Sonco and verified by ITA and then allocated an additional "estimated scrap cost" to limited service OCTG. Defendant claims that ITA did not utilize the scrap costs submitted by Sonco because of discrepancies found in the data and allocated estimated scrap costs to both prime and limited service pipe. Because the citations to the record provided by both parties are not particu-

larly helpful in resolving this confusion, an explanation of ITA's methodology here would be appropriate.

**16.** Plaintiff had initially argued that ITA erred in using a specific incorrect period, instead of the verified period. Subsequently, plaintiff argued more generally that ITA based its calculations on something other than the verified period. This argument was supported by calculations which plaintiff made, attempting to replicate ITA's calculations, but arriving at different figures.

period cited by plaintiff.[17] *See* Sonco/Benmit Cost of Production Verification Exhibit C24, at 537A, 539A.

### CONCLUSION

This determination is remanded for reconsideration consistent with this opinion. A new determination is to be issued within 45 days. If any party wishes to challenge the determination it shall confer with opposing counsel and submit a briefing schedule within 10 days of the determination on remand.

SO ORDERED.

17. Plaintiff's failure to arrive at the same results as ITA apparently resulted from its use of different figures in its calculation. ITA's method of calculating home market credit expenses involved three basic factors: selling price, time period, and interest rate. In seeking to replicate ITA's calculation, plaintiff used different selling prices and exchange rates than ITA had used, and therefore, it was unable to match ITA's final results by using the verified period at issue. *Compare* Supplemental Brief of Sonco, at Attachments A & B *with* Sonco/Benmit Cost of Production Verification Exhibit C24, at 537A (initial ITA calculation), 539A (revised underlying cost figures), 542A (applicable exchange rate) *and* Amend CR 10, at 250A (resulting home market credit expenses). Plaintiff has not challenged ITA's choice of selling price figures or exchange rates.