SILVER REED AMERICA, INC. and Silver Seiko, Ltd., Plaintiffs,

Brother International Corp. and Brother Industries, Ltd., Plaintiff–Intervenors,

v.

UNITED STATES of America, Defendant,

Smith Corona Corporation (f/k/a Consumer Products Division, SCM Corporation), Defendant–Intervenor.

SMITH CORONA CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant,

Silver Reed America, Inc., Silver Seiko, Ltd., Brother International Corp., Brother Industries, Ltd., and Nakajima All Co., Ltd., Defendant–Intervenors.

Court No. 83–10–01522.

United States Court of International Trade.

Oct. 7, 1988.

Willkie Farr & Gallagher, Christopher A. Dunn and Zygmunt Jablonski, Washington, D.C., for Silver Reed America, Inc. and Silver Seiko, Ltd.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Jessica Wasserman, Washington, D.C., Robert E. Walton, Gen. Counsel, New Canaan, Conn., for Smith Corona Corp.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., (Velta A. Melnbrencis, Atty.), for U.S., New York City, Jean Heilman Grier, Atty. Adviser, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel.

## MEMORANDUM OPINION AND ORDER

NEWMAN, Senior Judge:

### Introduction

On June 16, 1988 the International Trade Administration, United States Department of Commerce ("ITA"), issued its Revised Final Results of Antidumping Duty Administrative Review of Portable Electric Typewriters ("PET"s) from Japan ("Revised Final Results") pursuant to this court's remand, *Silver Reed America, Inc. and Silver Seiko, Ltd. v. United States*, 12 CIT ——, 679 F.Supp. 12 (1988), *rev'd in part and remanded on other grounds*, 12 CIT ——, 683 F.Supp. 1393 (1988). Plaintiffs Silver Reed America, Inc. and Silver Seiko, Ltd. (collectively "Silver") challenge various aspects of the Revised Final Results. Silver, the United States and Smith Corona Corporation have submitted briefs commenting on the Revised Final Results.

For the reasons that follow, the Revised Final Results are affirmed in part and remanded.

In its prior remand, the court directed ITA to correct errors regarding the deduction of imputed currency exchange rate losses from the United States Price and the double-counting of certain interest costs. Additionally, the court requested ITA to reconsider Silver's claim for a level of trade adjustment and to further articulate the agency's rationale for rejecting the evidence Silver proffered on that issue.

In its Revised Final Results, ITA: (1) recalculated the adjustments to United States Price to exclude from indirect selling expenses the amount previously included for imputed currency exchange rate losses;[1] (2) corrected an error in deducting imputed interest expenses from United States Price; (3) corrected a clerical error found in reviewing a computer printout used in the first administrative review; and (4) again rejected Silver's claim for a level of trade adjustment.

Silver contests the Revised Final Results, and asserts: (1) ITA's correction of the double-counting of indirect selling expenses was erroneous in that ITA incorrectly characterized Silver Reed's actual borrowings used to finance inventory as direct credit costs when it should have considered them as the exclusive indirect selling costs associated with the purchase of inventory prior to resale; and (2) ITA's refusal to grant an adjustment for differences in levels of trade is not based on any evidence in the record.

The court affirms ITA's Revised Final Results except for its refusal to grant Silver a level of trade adjustment.

### Double-counting of interest costs

ITA reports in its Revised Final Results that in reviewing pertinent portions of the administrative record to determine whether there was any double-counting of adjustments to Exporter's Sales Price ("ESP"), the agency found that it had double-counted interest costs. Revised Final Results, at 2–5; deft's brief, at 3. While Silver admits that ITA has eliminated the double-counting of interest costs (Silver's brief, at 2), Silver insists that ITA's position is wrong on the facts regarding whether Silver Reed incurred borrowings to permit it to pay Silver Seiko for the PETs shipped from Japan.

It appears that ITA deducted, as Silver Reed's "direct" cost of credit, the cost of Silver Reed's actual borrowings from U.S. banks. ITA also imputed an "indirect" credit cost for the period that Silver's PETs were held in inventory. While ITA has corrected the double-counting of interest costs that concededly occurred, Silver continues to dispute ITA's interest calculations concerning the nature of the costs incurred.

■ In essence, Silver Reed claims the record shows it borrowed funds from U.S.

1. While ITA treated the expenses in issue as currency exchange losses, intervenor contends that, absent verification by ITA, such expenses should be treated as expenses incurred by Silver Reed in currency hedging and deducted from Exporter's Sales Price pursuant to 19 U.S.C. § 1677a(e)(2). However, intervenor has pointed ed to nothing in the record establishing its contention or warranting a further remand on the issue of currency exchange rate losses.

banks whenever it had to pay Silver Seiko for the inventory of PETs it purchased. Consequently, argues Silver, these costs were "indirect" costs used to reimburse the parent company for merchandise Silver Reed held in inventory and these costs had no direct relationship to Silver Reed's resale of the merchandise.

Hence, according to Silver, ITA "got it[s] [interest calculations] exactly backwards" (Silver's brief, at 7), *viz.:* ITA deducted actual borrowings as a *direct* credit cost and imputed an interest cost for the "indirect cost" of inventory holding, whereas ITA should have deducted Silver Reed's actual borrowings as the exclusive indirect cost of holding inventory and imputed a direct credit cost only for the period between Silver Reed's resale and its receipt of payment from its customer. Silver Reed further maintains that since it "did not and could not know whether particular merchandise was resold at the moment it borrowed funds to repay Silver Seiko, those borrowing costs *had to have been indirect* selling costs rather than direct selling costs" (Silver's brief, at 7, emphasis in original).

The record establishes that Silver Reed did not finance its inventory by borrowing funds, but rather shows that its actual borrowings were incurred after Silver Reed's merchandise had already been resold in order to finance extended payment terms to its United States customers. Therefore, ITA's imputation of credit costs for the prepayment period was correct, and its use of actual credit costs for the period between sales by Silver Reed to its customers and repayment by those customers was similarly correct.

In sum, the court finds that ITA's recalculation of indirect and direct interest costs is proper and Silver's request for a further remand on this issue is denied.

## Level of Trade

During the administrative review, Silver claimed a circumstance-of-sale adjustment under 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. § 353.19 to account for the fact that Silver Seiko's U.S. purchase sales[2] were compared with home-market sales at a different level of trade. The purchase price sales were made directly to wholesale distributors (*i.e.*, original equipment manufacturers) in the United States, while the comparison sales in Japan were made exclusively to retailers through Silver Seiko's related selling subsidiary, Silver Business Machines ("SBM"). Silver claimed that the difference in selling costs relating to the different levels of trade in the two markets were the additional expenses incurred by SBM in selling to Japanese retailers rather than selling directly to wholesalers. Thus, because ITA used the home-market sales to retailers for comparison with the purchase price sales to United States wholesalers, Silver argues that the additional expenses incurred by Silver Seiko in selling beyond the wholesale level in Japan (*i.e.*, SBM's expenses) should have been deducted from the home-market prices pursuant to 19 C.F.R. § 353.19.

In the Final Results of the first administrative review, ITA denied Silver's claim for a level of trade adjustment assertedly because, *inter alia*, "Silver Seiko did not adequately demonstrate that the difference in cost between the two markets is due to a difference in level of trade." 48 Fed.Reg. at 40764–65. Ostensibly, then, ITA does not dispute that Silver Seiko's home market sales to retailers (through SBM) and its United States sales directly to wholesale distributors were at different levels of trade, nor that there were cost differences in selling PETs in the two markets.[3] In remanding the action, the court directed ITA to fully explain its position thât "Silver Seiko did not adequately demonstrate that the difference in cost between the two mar-

---

**2.** Silver Seiko engaged in both Exporter's Sales Price sales to its related-party subsidiary in the United States (Silver Reed) and Purchase Price sales to its unrelated U.S. customers. The level of trade issue concerns Silver Seiko's Purchase Price sales in the United States.

**3.** Defendant also does not dispute Silver's contention that ITA verified and accepted Silver's calculation of costs. *See* First Silver Seiko Verification Report at 13, A.R. 2819; Second Silver Seiko Verification Report at 8–9, A.R. 5295–96.

**294**

kets is due to a difference in level of trade," and to specifically disclose wherein Silver failed in its proof in this matter. 679 F.Supp., at 20. ITA did comply with the remand order in those aspects.

ITA, in the Revised Final Results, reaffirms its "determination that Silver has not met its burden of providing a sufficient basis for a level of trade adjustment." Revised Final Results, at 6. According to ITA, Silver had the burden of establishing that the difference in price between the United States sales and home-market sales is attributable to a difference in the levels of trade rather than simply to differences resulting from disparate market conditions in two distinct markets. *Id.*, at 7–8. Further, ITA contends that "[a]n adjustment cannot be made for differences in level of trade just because costs are different when comparing sales to the United States and sales in the home market." *Id.* at 8, quoting from *"Final Determination of Sales at Less Than Fair Value; Certain Internal–Combustion, Industrial Forklift Trucks from Japan,* 53 Fed.Reg. 12552, 12576 (Comment 86) (April 15, 1988)." And ITA further commented:

> In order to determine whether differences in level of trade affect price comparability, it is necessary to compare what those differences would be *within the same market.* Absent evidence establishing differences within the same market, it is not possible to determine that cost differences between two different trade levels in two different markets are not merely the result of differing economic conditions in the two markets. In order to make an accurate comparison, it is necessary to compare sales at different levels of trade, or else the comparisons are meaningless.

To qualify for a level of trade adjustment, Silver would have to demonstrate that it incurred different selling expenses in selling to different levels of trade in the home market, *i.e.,* retailers and wholesalers. Since Silver did not make sales to wholesalers in the home market

during the review period, the Department could not make an appropriate comparison of different selling expenses at different levels.

*Id.* at 11 (emphasis in original). Specifically, as erroneously found by ITA, Silver failed in its burden of proof in that "Silver simply supplied information which showed that the cost of distributor sales in the U.S. was different from the cost of retail sales in Japan * * * [and] [t]his data does not establish what the price differences between the two levels within Japan would have been." *Id.*, at 10.

Silver strenuously disputes that it "simply supplied information" showing that the cost of distributor sales in the United States was different from the cost of retail sales in Japan. Essentially, Silver stresses that, in conformity with ITA's standard of proof, Silver quantified the difference between the cost of selling to a wholesale distributor *in Japan (i.e.,* SBM) and the cost of selling to retailers *in Japan.* Silver's brief, at 3.

Since ITA compared Silver Seiko's sales to its United States distributors with SBM's sales to unrelated retailers in Japan, Silver concedes that it had the burden of showing what its sales price would have been in Japan to an unrelated distributor. Silver claims that it sustained such burden of proof "by taking SBM's resale price to retailers and backing out SBM's *cost of resale* " (A.R. 6676–77). Silver's brief, at 3–4 (emphasis in original). In essence, Silver maintains that it proved what the maximum price of selling to an unrelated distributor in Japan would have been and that ITA verified the amount of the resale costs. *Id.*

 Defendant and intervenor advance the *post hoc* rationale that Silver improperly relied upon the costs of selling to retailers through its related distributor in Japan as a reliable measure of the actual selling expenses that would have been incurred by Silver Seiko in selling to an unrelated distributor in the home market.[4]

---

**4.** Fundamentally, of course, *post hoc* rationalizations of Government counsel may not be re-

lied upon to uphold agency action. *SCM Corp.*

The court concludes, however, that the relationship between Silver Seiko and SBM does not, standing alone, disqualify Silver's proof of its home market selling expenses for purposes of establishing a level of trade adjustment. Moreover, ITA's findings that (1) "Silver offered its cost of distributor sales in the United States as evidence of what costs at that same level of. trade would have been in Japan" (Revised Final Results, at 10), and that (2) "Silver simply supplied information which showed that the cost of distributor sales in the U.S. is different from the cost of retail sales in Japan" (*Id.*) are patently lacking in substantial evidence on the record.

Notwithstanding that 19 U.S.C. § 1677b(a)(4) requires an adjustment to foreign market value only "if it is established to the satisfaction of the administering authority that the amount of any difference between United States price and the foreign market value * * * is wholly or partly due to * * * other differences in circumstances of sale," ITA's broad discretion to determine whether a factor or condition of sale warrants an adjustment in foreign market value must be exercised reasonably and in a non-arbitrary manner. *Sonco Steel Div., Ferrum, Inc. v. United States,* 12 CIT ——, Slip Op. 88–109, 694 F.Supp. 959 (1988). The court recognizes that although Silver had the burden of demonstrating entitlement to a level of trade adjustment, the court finds that under the circumstances presented herein, ITA has exercised its discretion under section 1677b(a)(4) in an unreasonable manner.

Inasmuch as Silver Seiko's United States sales were made to wholesale distributors (original equipment manufacturers), Silver's claim for a level of trade adjustment subsumed that Silver did *not* have sales in Japan to an unrelated wholesale distributor. On this score, the court must agree with Silver that if Silver had made sales in Japan to an unrelated wholesale distributor, a level of trade adjustment would have been entirely inappropriate since ITA

would have simply compared sales in the two markets at the same level of trade, as required by 19 C.F.R. § 353.19. Therefore, defendant's rejection of Silver's proof merely because Silver Seiko sold to retailers in Japan through its related distributor (SBM) imposes a "catch–22" burden of proof on Silver that makes it virtually impossible for Silver to qualify for a level of trade adjustment. Such unreasonable burden of proof must be rejected.[5]

Silver amply demonstrated to ITA that its home market sales to retailers through SBM incurred additional selling costs *vis-a-vis* Silver's United States sales to wholesale distributors, and significantly, Silver's selling costs were verified by ITA (*see* n. 3, *ante*). ITA has not expressly considered the forgoing facts in the Revised Final Results. Under these circumstances, the interests of justice require that the level of trade issue be again remanded to ITA for reconsideration of whether Silver's evidence has reasonably quantified the difference in its selling costs in the two markets due to the difference in the levels of trade.

*Conclusion*

ITA's Revised Final Results are affirmed in all respects excepting its denial of a level of trade adjustment. With respect to that limited issue, this action is remanded to ITA for its reconsideration of Silver's evidence consistent with the views expressed herein.

ITA's new Revised Final Results shall be reported to the court within thirty days after the issuance of this order. If any party wishes to challenge these new Revised Final Results, it shall confer with opposing counsel and submit a briefing schedule within ten days of the report to the court.

*v. United States,* 4 CIT 7, 11 n. 4, 544 F.Supp. 194, 198 n. 4 (1982).

**5.** The court also rejects intervenor's *"post-hoc"* contention that Silver is not entitled to a level-of-trade adjustment since "Silver failed to show

that the expenses [of SBM] were directly related to distributor-level sales and not simply to overhead of SBM, incurred regardless of the level of trade." Intervenor's brief, at 4.