SILVER REED AMERICA, INC. and
Silver Seiko, Ltd., Plaintiffs,

Brother International Corp. and
Brother Industries Ltd.,
Plaintiffs–Intervenors,

v.

UNITED STATES of America,
Defendant,

Smith Corona Corporation (f/k/a Con-
sumer Products Division, SCM
Corporation), Defendant-Intervenor.

SMITH CORONA
CORPORATION, Plaintiff,

v.

UNITED STATES of America,
Defendant,

Silver Reed America, Inc., Silver Seiko,
Ltd., Brother International Corp.,
Brother Industries, Ltd., and Nakajima
All Co., Ltd., Defendants–Intervenors.

Court No. 83–10–01522.

United States Court of
International Trade.

April 4, 1989.

Willkie Farr & Gallagher, Christopher A. Dunn and Zygmunt Jablonski, Washington, D.C., for Silver Reed America, Inc. and Silver Seiko, Ltd.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart and James R. Cannon, Jr., Special Counsel, Washington, D.C., for Smith Corona Corp.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C., and Velta A. Melnbrencis, Atty., Commercial Litigation Branch, Civ. Div., Dept. of Jus-

tice, New York City, Jean Heilman Grier, Atty.–Adviser, Office of the Chief Counsel, Washington, D.C., for Intern. Trade, U.S. Dept. of Commerce, of counsel, for U.S.

## MEMORANDUM OPINION AND ORDER

NEWMAN, Senior Judge:

On June 16, 1988 the International Trade Administration, United States Department of Commerce ("ITA"), issued its Revised Final Results of Antidumping Duty Administrative Review of Portable Electric Typewriters ("PETs") from Japan ("*Revised Final Results*") pursuant to the court's order of remand.[1] Plaintiffs Silver Reed America, Inc. and Silver Seiko, Ltd. (collectively "Silver") challenged various aspects of the Revised Final Results, including ITA's reaffirmation of its prior "determination that Silver has not met its burden of providing a sufficient basis for a level of trade adjustment." *Revised Final Results* at 6.

On October 7, 1988 the court affirmed the *Revised Final Results* except for ITA's refusal to grant Silver a level of trade adjustment. *Silver Reed America, Inc. v. United States,* — CIT —, 699 F.Supp. 291 (1988). On that score, the court found, *inter alia:* "Silver amply demonstrated to ITA that its home market sales to retailers through SBM [Silver Business Machines] incurred additional selling costs *vis-a-vis* Silver's United States sales to wholesale distributors, and significantly, Silver's selling costs were verified by ITA * * *. ITA has not expressly considered the foregoing facts in the Revised Final Results." *Id.,* 699 F.Supp. at 295. In view of the foregoing circumstances, the court again remanded this action regarding the level of trade issue and directed that ITA reconsider "whether Silver's evidence has reasonably quantified the difference in its selling costs in the two markets due to the difference in the levels of trade." *Id.*

On December 7, 1988 ITA reported to the court the results of the October 7, 1988 remand, which report advised that the agency had considered the fact that Silver's home market sales to retailers through SBM incurred additional selling costs *vis-a-vis* Silver's United States sales to wholesale distributors, but nevertheless had "determined that no level of trade adjustment is appropriate." *See Remand Results, Silver Reed America, Inc. v. United States,* December 7, 1988 ("*Remand Results*") at 1. ITA's determination on remand to again deny Silver's claim for a level of trade adjustment to its foreign market prices is contested by Silver and is presently before the court for review.

The background of this dispute concerning a level of trade adjustment to Silver's foreign market prices is fully set forth in the court's opinion of October 7, 1988, — CIT —, 699 F.Supp. 291, and familiarity with that opinion is presumed.

Briefly, Silver claims a level of trade adjustment to its home market prices under 19 U.S.C. § 1677b(a)(4)(B) and 19 CFR § 353.19 to account for the fact that Silver Seiko's U.S. purchase price sales were compared with home market sales at a different level of trade. There is no dispute that Silver Seiko's purchase price sales were made directly to wholesale distributors (*i.e.,* original equipment manufacturers) in the United States, while the comparison sales in Japan were made exclusively to retailers through Silver Seiko's related selling subsidiary, Silver Business Machines ("SBM"). Silver claims that the difference in selling costs relating to the different levels of trade in the two markets were the additional expenses incurred in selling to Japanese retailers through SBM rather than selling directly to wholesalers. Thus, because ITA used the home market sales to retailers for comparison with the purchase price sales to United States wholesalers, Silver argues that the additional indirect expenses incurred by Silver Seiko in selling beyond the wholesale level in Japan (*i.e.,* SBM's "indirect" expenses) should have been deducted from the home market prices pursuant to 19 CFR § 353.19.

---

1. *Silver Reed America, Inc. and Silver Seiko, Ltd. v. United States,* — CIT —, 679 F.Supp. 12 (1988), *rev'd in part and remanded,* — CIT —, 683 F.Supp. 1393 (1988).

In support of its December 7, 1988 determination in the *Remand Results* to deny Silver's claim for a level of trade adjustment, ITA relies on essentially four reasons:

First, ITA posits that information concerning the selling expenses incurred by Silver's subsidiary, SBM, in selling PETs to retailers in Japan "by itself is not sufficient evidence of the existence or size of a level of trade differential." *Id.* at 6. ITA states it is not willing to assume that an unrelated distributor's selling expenses would be the same as those of SBM absent any evidence supporting such assumption.

Second, the fact Silver's home market sales to retailers through SBM incurred additional selling costs *vis-a-vis* Silver's United States sales to wholesale distributors cannot support a conclusion that these cost differences are due only to differing levels of trade, or that if the levels of trade had been the same in the home and United States markets, none of SBM's expenses would have been incurred by Silver. Hence, while conceding that Silver sells at different levels of trade in the United States and Japan, ITA contends, "Silver has not isolated any additional expenses associated with the difference in level of trade from expenses resulting from other differences between the two markets." *Remand Results* at 8.

Third, the expenses in question are solely indirect expenses, and "[a]n unlimited allowance of indirect expenses in the home market, for any reason, including a difference in levels of trade, would conflict with [ITA's] practice of generally limiting price adjustments to direct expenses." *Id.* at 9. ITA advises that SBM's direct expenses would already have been adjusted for under 19 CFR § 353.15 as a difference in circumstances of sale. *Id.* at 8.

Fourth, Silver failed to show precisely how the differing levels of trade affect the prices and absent such showing, there is no logical basis for making the adjustment to those prices.

Silver's response is that ITA's position establishes unreasonable standards that effectively block Silver from the level-of-trade adjustment authorized by 19 U.S.C. § 1677b(a)(4)(B) and 19 CFR § 353.19.

The issue is whether ITA reasonably exercised its discretion in rejecting Silver's claim for a level of trade adjustment to its foreign market prices based on the indirect expenses incurred by Silver's related distributor, SBM, in selling PETs to retailers in Japan.

 As we have noted previously, and reaffirm, SBM's expenses are not, *ipso facto,* disqualified from consideration by ITA as a basis for establishing a level of trade adjustment merely because of the relationship between Silver and SBM. Nonetheless, it is obvious that such relationship warrants close scrutiny, caution and the exercise of discretion by the agency regarding whether or not to accept a related party's expenses as a basis for a level of trade adjustment.

 Silver insists that in light of SBM's selling expenses, which were verified by ITA, the rejection of a level of trade adjustment was an unreasonable exercise of ITA's discretion. However, ITA points up, quite correctly, that in selling to retailers through SBM, Silver has complete discretion as to where to place any of its sales functions and where to account for expenses without affecting total corporate profit. On the other hand, had Silver sold PETs through an unrelated distributor, allocation of responsibilities and expenses would have directly affected Silver's profit. Hence, according to ITA, "Silver provided no information demonstrating which, if any, additional expenses it might have to assume. Absent supporting evidence the Department cannot assume that SBM is performing no functions (and incurring no expenses) which Silver would perform if it were selling to an unrelated distributor." *Remand Results* at 6–7.

In its Remand Results, ITA suggested several acceptable avenues of proof that Silver could have pursued, other than the expenses of a related party, for quantifying a level of trade adjustment. Candidly, these suggested approaches to quantifying a level of trade adjustment appear to be

**630**

impractical or inapplicable to Silver, who sold typewriters solely to retail purchasers in Japan through a related distributor.[2]

Nonetheless, the court is constrained to hold that the particular methodology of quantifying the adjustment selected by Silver (*viz.*, based solely on the selling costs of its related distributor, SBM) was not unreasonably rejected by ITA. Given the particular related party expense methodology relied upon Silver, the court cannot say that ITA is required to allow the adjustment and assume that SBM's selling expenses would be the same as that of an unrelated distributor.[3]

Implementation of the level of trade adjustment prescribed by 19 CFR § 353.19 is indisputably a responsibility of ITA involving agency expertise and the reasonable exercise of discretion. The court has no doubt that Silver's claim has received thorough consideration by ITA at the various stages of the administrative review and subsequent litigation between the parties. Unfortunately, as this case progressed defendant presented different rationales for

2. ITA indicates in its *Remand Results* at 10 that it would grant a level of trade adjustment predicated upon proof of any of the following: (1) Home market sales that would be "insufficient" (*i.e.,* too small in number) to permit an adequate comparison of prices on the same commercial level of trade pursuant to 19 C.F.R. § 353.19; (2) comparison of sales of "less similar merchandise," or of identical merchandise sold within the period of review, but too distant in time from the U.S. sale to be used to establish the foreign market value; and (3) information provided by the exporter demonstrating that the expenses of a competing manufacturer's unrelated distributor in selling merchandise of the same class or kind closely approximate those of the exporter's related distributor. Inasmuch as Silver had *no sales whatever,* in either categories (1) or (2), *supra,* to unrelated distributors in Japan, the first two forms of proof suggested by ITA would appear to have no applicability to Silver. Regarding number (3), the court must agree with Silver that ITA's belief that Silver could have obtained confidential cost data from its competitors totally disregards commercial reality and is a standard that is "almost inherently impossible to satisfy." *Silver's brief* at 3.

The court must also question ITA's candor in the methods of proof it suggests are appropriate in light of the fact the agency has persisted in contending there is no data which a respondent can supply to quantify the difference between the United States and foreign level of trade

denying the adjustment to Silver, and I have expressed concern that the burden of proof imposed by ITA regarding the level of trade adjustment is unreasonable. *See* 699 F.Supp. at 295.

In *American Permac, Inc. v. United States,* — CIT —, 703 F.Supp. 97 (1988), the court found on the basis of the "exhaustive submissions of substantiating data" presented by plaintiffs, that ITA had unreasonably disallowed a level of trade adjustment on the ground that plaintiffs had failed to quantify the adjustment. Thus, concerning the evidence submitted, the court found the following (quoting from the opinion at length):

Plaintiffs advocated *several alternative methods to measure or quantify the appropriate amount of the level of trade adjustments* during the proceedings below. In addition to arguing that a 30 percent discount from the list price, which was given to all distributors in the United States, represented the appropriate adjustment, plaintiffs suggested *sev-*

when only one level of trade exists in the home market. *See Silver,* 699 F.Supp. at 294; *American Permac, Inc. v. U.S.,* 703 F.Supp. at 97, 100 (CIT 1988).

Further, the court notes that ITA disallows a level of trade adjustment for direct expenses since direct expenses would have already been taken into account under 19 CFR § 353.15 as a difference in circumstance of sale. Accordingly, Silver's claim for a level of trade adjustment is limited to indirect expenses. Unfortunately for Silver, ITA also disallows a level of trade adjustment for indirect expenses. Therefore, it would seem that whether Silver claimed a level of trade adjustment for either direct or indirect expenses, it would have been faced with yet another "catch-22" burden of proof impossible to meet.

3. Silver contends that the deduction of SBM's expenses from the prices SBM charges to retailers represents the maximum price at which Silver would sell to an unrelated distributor. ITA maintains: "Obviously, Silver is assuming that the unrelated distributor's selling expenses would be the same as SBM's. However, Silver has not provided any evidence supporting that assumption. Given that lack of support, it is just as reasonable to assume that an unrelated distributor would have lower expenses than SBM. If so, that distributor could pay a higher price than the maximum Silver postuates." *Remand Results* at 6.

*eral other methods of measuring the adjustment* and provided substantiating information necessary to implement those methods.

Plaintiffs submitted a detailed accounting study of the actual expenses which Boewe would not have to incur in Germany if it sold the merchandise to distributors, rather than to end users....

Plaintiffs also furnished data related to its [sic] sales in Austria through a distributor and argued that, since Austrian and German markets are very similar, the actual sale prices to distributors in Austria is [sic] a reliable and acceptable measurement of a level of trade adjustments [sic] to their home market prices. The third method suggested by plaintiffs involved the use of the price structure of another German company, Seco, which was also subject to this administrative review. Seco did have sales of dry cleaning machines in Germany during the relevant period to both end-users and distributors. Finally, plaintiffs suggested that the ITA measure the level of trade adjustment by reference to plaintiffs' home market sales of forms handling machinery, which were made at both levels of trade, but which were not subject to this review.

*Id.,* 703 F.Supp. at 99 (emphasis added).

However, the contrast between the type of proof submitted by plaintiffs in *Permac* and that offered by Silver in the instant case is readily apparent. Silver has attempted to substantiate its claim for a level of trade adjustment solely by the expenses incurred by SBM which could, as feared by ITA, be subject to manipulation by the related companies. Clearly, such proof by Silver is not at all comparable to the extensive, multifaceted, and therefore more probative, submissions by plaintiffs in *Permac,* which proof the *Permac* court found could have been utilized by ITA to arrive at its own estimations of the adjustment and the hypothetical price to distributors in the home market.

Consequently, *Permac* is readily distinguishable from the instant case and is not a pr...dent for the methodology utilized by

Silver in the current situation for quantifying a level of trade adjustment.

In sum, the court fully agrees with ITA's first reason, as set forth above, for denying Silver's claim for a level of trade adjustment, and therefore finds that ITA properly exercised its discretion in rejecting Silver's claim for a level of trade adjustment. Hence, it is unnecessary to address ITA's additional grounds.

Accordingly, it is hereby ORDERED:

1. The *Remand Results* of December 7, 1988 are affirmed; and

2. The *Revised Final Results of Antidumping Duty Administrative Review of Portable Electric Typewriters from Japan of June 16, 1988* are affirmed.

A final judgment will be entered affirming the *Revised Final Results.*