**NAR, S.p.A., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Minnesota Mining and Manufacturing Company, Defendant–Intervenor.**

No. 86–12–01638.

United States Court of International Trade.

Jan. 27, 1989.

---

Siegel, Mandell & Davidson (Brian S. Goldstein and Judith M. Barzilay), New York City, for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Sheila N. Ziff), Washington, D.C., of counsel: Diane McDevitt, Attorney–Advisor, Office of the Deputy Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Baker & McKenzie (Thomas P. Ondeck and Arthur L. George), Washington, D.C., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiff, NAR, S.p.A. (NAR), has moved for judgment upon the administrative record pursuant to Rule 56.1 of the Rules of this Court. It challenges the findings of the International Trade Administration of the Department of Commerce (Commerce) in the third administrative review of an antidumping duty order covering certain plastic tape from Italy. *Pressure Sensitive Plastic Tape From Italy; Final Results of Antidumping Duty Administrative Review,* 51 Fed.Reg. 43,955 (Dec. 5, 1986). The contested review, covering NAR's entries from July 1, 1979 to September 30, 1984, found dumping margins ranging from 2.40 percent to 4.76 percent.[1] NAR argues that but for several errors in Commerce's methodologies and calculations, *de minimus* or no dumping margins would have been assessed.

### Background

NAR is one of several manufacturers and/or exporters subject to the affirmative antidumping determination regarding the subject merchandise made by the Secretary of Treasury on October 21, 1977. 42 Fed.Reg. 56,110.[2] The first two administrative reviews of the subject merchandise did not include NAR nor several other manufacturers and/or exporters. 48 Fed.Reg. 35,686 (Aug. 5, 1983); 50 Fed.Reg. 38,698 (Sept. 24, 1985).

Acting on NAR's request, Commerce initiated a third administrative review on November 27, 1985. 50 Fed.Reg. 48,825. The preliminary results showed dumping margins ranging from 5.17 percent to 7.03 percent for NAR's entries from July 1, 1979 to September 30, 1984. 51 Fed.Reg. 35,383 (Oct. 3, 1986). On October 16, 1986, a disclosure conference took place pursuant to 19 C.F.R. § 353.53a(c)(6) to discuss Commerce's preliminary determination. *Plaintiff's Memorandum* at 11; *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon an Agency Record* at 13 (*Defendant's Memorandum*). Commerce made certain amendments to its preliminary findings in light of the disclosure conference and the interested parties' submission of final

---

1. The review in question encompassed eight manufacturers and/or exporters of the subject merchandise and periods from Feb. 18, 1977 through Sept. 30, 1985. NAR excludes from its challenge Commerce's findings against entries made between July 1, 1979 and Dec. 31, 1979. *Plaintiff's Memorandum in Support of Motion for Judgment Upon an Agency Record* at 3 [hereinafter *Plaintiff's Memorandum*].

The following duty margins were assessed against NAR's entries for the contested periods:

July 1, 1979 through Sept. 30, 1980—4.76%
Oct. 1, 1980 through Sept. 30, 1981—2.66%
Oct. 1, 1981 through Sept. 30, 1982—2.40%
Oct. 1, 1982 through Sept. 30, 1983—4.61%
Oct. 1, 1983 through Sept. 30, 1984—4.51%

51 Fed.Reg. at 43,958.

2. With the transfer of administration of the antidumping laws from the Treasury Department to Commerce on Jan. 2, 1980, Exec. Order No. 12,188, 45 Fed.Reg. 989 (Jan. 4, 1980), Commerce began to conduct administrative review of outstanding antidumping findings.

briefs, yielding final dumping margins in the range of 2.40 to 4.76 percent. 51 Fed. Reg. at 43,958.

NAR disputes these margins on five grounds. It alleges that: (1) Commerce's comparison of United States price and foreign market value [3] is flawed because it (a) erroneously compared home market sales at all levels of trade with wholesale-level sales in the United States and otherwise failed to make adjustments, and (b) incorrectly matched sales of identical goods in the U.S. with home market sales for purposes of making price comparison without taking into consideration the price impact of time lag; (2) Commerce improperly applied the averaging methodology; (3) Commerce's circumstances of sales adjustments in calculating foreign market value were unreasonable, namely, because it (a) limited the offset for commissions paid in the home market to indirect selling expenses in the United States, (b) denied adjustments for transportation costs incurred in making sales in the home market, and (c) disallowed adjustments for advertising expenses; (4) Commerce incorrectly used the quarterly exchange rates published by the Federal Reserve Board rather than the actual rates NAR used; and (5) Commerce violated due process by failing to conduct administrative reviews on an annual basis and by providing improper data and insufficient time to adequately prepare for the disclosure conference held on October 16, 1986.

### Discussion

#### A. Level of Trade Adjustments for Such or Similar Merchandise

The United States antidumping duty laws are designed to counteract price discrimination which occurs when foreign producers sell physically identical or similar merchandise for a lower price in the U.S. market than in their home or third country markets. *See generally* 19 U.S.C. §§ 1677–1677b (1982 & Supp. III 1985); 19 C.F.R. §§ 353.1–.23. To ascertain whether any price discrimination has occurred, Commerce compares the U.S. price and foreign market value. In making this comparison, Commerce is authorized under 19 U.S.C. §§ 1677a(d)-(e) and 1677b(a)(4) to make adjustments for certain cross-market differences in the merchandise, including those relating to difference in levels of trade. Specifically, § 1677b(a)(4) states that adjustments will be made if the claimant "establishe[s] to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to" different quantities sold or to "other differences in circumstances of sale" in the markets being compared. 19 C.F.R. § 353.19 similarly provides that if Commerce makes comparisons at different commercial levels of trade, "appropriate adjustments will be made for differences affecting price comparability." Wholesale, retail, and end-user sales, for instance, each represent different levels of trade.

It is undisputed that NAR sold exclusively to wholesalers in the United States during the review periods. NAR takes issue with Commerce's decision to compare the U.S. wholesale sales with all of NAR's home market sales, arguing that its home market customers consisted not only of wholesalers, but also retailers, and end-users. It asserts that Commerce should have excluded from calculation its sales to end-users, i.e., small volume purchasers, or otherwise made adjustments to account for their inclusion. In short, NAR demands a comparison of the U.S. wholesale sales with home market sales that NAR designates as wholesale and retail sales.[4] Commerce justifies its methodology on grounds that NAR's method of designation does not satisfy the requirements demanded by the provisions governing different levels of

---

**3.** The term "foreign market value" is used generally to mean both the "foreign market price," and "home market price" since NAR's sales to unrelated buyers in its home market were used. *See* 19 U.S.C. § 1677b (1982 & Supp. III 1985); 19 C.F.R. §§ 353.2–.9.

**4.** NAR does not contend the inclusion of retail sales; its challenge is limited to the inclusion of end-user sales.

trade. 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 353.19.

■ Insofar as NAR only makes a quantity-based claim for level-of-trade adjustment, its invocation of *Silver Reed America, Inc. v. United States,* 7 CIT 23, 30, 581 F.Supp. 1290, 1295 (1984), *rev'd on other grounds sub nom, Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985) is misplaced. *Silver Reed* clarified that the pertinent statutory and regulatory provisions permit level-of-trade adjustments on the basis of different quantities sold as well as on the basis of other non-quantity grounds. In other words, when Commerce compares one discrete level of trade in one market with another discrete level of trade in the other market, adjustments will be made if claimant sufficiently proves that any difference in price in the two markets for an identical product is due to quantity-discounts given to larger volume buyers *or to other costs incurred* as a result of making sales at several levels of trade. "Frequently, of course, the level of trade will *correlate* with the quantity involved ... but this is not necessarily true in every case." *Id.* at 1296 (emphasis in original); *see also Silver Reed America, Inc. v. United States,* 12 CIT ——, 699 F.Supp. 291 (1988); *American Permac, Inc. v. United States,* 12 CIT ——, 703 F.Supp. 97 (1988). Regardless of the particular form of level-of-trade claim, the rationale for allowing adjustments is that the price differential between the U.S. price and the foreign market value is attributable solely to presence of different levels of trade. *See* 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 353.19.

Since NAR only makes a quantity-based claim for level-of-trade adjustment, it was incumbent on NAR to furnish evidence of a consistent pricing policy that is uniquely connected to quantities of sale. NAR submitted data which showed that NAR frequently gave substantial discounts to customers who bought in small quantities so that larger-volume, i.e., wholesale and retail, customers were charged higher prices for the same goods. *Plaintiff's Memorandum* at 15. Under these facts, Commerce properly determined that such erratic pricing policy falls far short of meeting the prerequisite for adjustment.

NAR nonetheless makes a claim for a level-of-trade adjustment on grounds that a yearly aggregation of all end-user sales would have revealed that higher prices were charged to them as a group than to higher volume purchasers. Such justificatory scheme necessarily fails because Commerce is not obliged to pursue the methodology that NAR demands, and more importantly, because NAR did not overcome the burden of proffering the consistent pricing policy discussed above.

NAR further contends that Commerce's comparison of merchandise consisting of identical physical characteristics led to distortion of prices. Pressure sensitive plastic tapes are produced in several colors, each of which designates the tapes' difference in size and determines the price. NAR insists that comparing the U.S. and home market sales by grouping several colors together, rather than matching identically colored tapes separately, would have resulted in the most appropriate comparison "from the standpoint of cost, physical characteristics and commercial features." *Plaintiff's Memorandum* at 22. Plaintiff theorizes that time lags between the sales of identically colored tapes in the U.S. and home market created price gaps for which adjustments should be made.

19 U.S.C. § 1677b(a)(1)(A) provides that merchandise exported to the United States will be compared with "such or similar merchandise" in the home market. Where sales of identical goods exist, comparison between them is the preferred methodology. 19 U.S.C. § 1677(16). *See also Monsanto Co. v. United States,* 12 CIT ——, 698 F.Supp. 275 (1988). Consistent with its practice, Commerce does not make adjustments for merchandise with identical physical characteristics, even if differences in cost of production exist, *Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change,* U.S. Dep't of Commerce (1985) at 53; 19 C.F.R. § 353.16; *Defendant's Memorandum* at 41–42, unless an exceptional mar-

ket situation renders comparison of identical goods unrealistic. *See Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 640 F.Supp. 255 (1986).

This approach comports with the U.S. antidumping law which, in general, is intended only to remedy harm caused by sales at "unfair" prices. The ramifications of a myriad of small and ordinary market forces, such as price impact of time lag in sale of identical goods, are a cost of doing business which any astute businessman would take into account in planning foreign ventures. Since NAR does not argue that it is entitled to an adjustment due to the existence of exceptional market conditions, Commerce properly rejected NAR's claim.

## B. *Averaging*

### 1) *Averaging and Adjustments*

■ When making adjustments for transportation costs NAR incurred in connection with its home market sales, Commerce made an entry-by-entry deduction rather than making deductions on the basis of weighted-average of all transportation expenses. NAR asserts that the use of weighted-average would have reduced or eliminated the incidence of dumping margins.

Under 19 U.S.C. § 1677f–1 (1984), Commerce has the power to use averaging in ascertaining U.S. price as well as foreign or home market value. The statute reads in part:

(a) In general

For the purpose of determining United States price or foreign market value ... the administering authority may—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is in-

volved or a significant number of adjustments to prices is required....

(b) Selection of samples and averages

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

*See* 1984 Trade and Tariff Act, Pub.L. 98–573, § 620(a), 98 Stat. 3039 (1984). This was an extension of Commerce's authority because the Trade Agreements Act of 1979, Pub.L. 96–39, § 773(f), 93 Stat. 186 (1979), which introduced the averaging methodology, permitted its use only in determining the foreign market value.[5]

Commerce has the authority under § 1677f–1 to adopt averaging methodology "whenever a significant volume of sales is involved or a significant number of adjustments to prices is required." § 1677f–1(a)(1). In this case, NAR's movement expenses associated with U.S. sales were adjusted on an entry-by-entry basis. Commerce does not rebut that the volume of sales or a number of adjustments to prices was insignificant, but explains, rather, that a sale-by-sale approach was used "since this more accurately reflects the actual expenses incurred." *Defendant's Memorandum* at 59. The Court thus sees no merit in NAR's demand.

### 2) *Averaging and Dumping Margins*

When calculating the dumping margins Commerce weight-averaged home market sale prices and compared the resulting foreign market value with individual U.S. sale prices. NAR contends the averaging methodology must be applied even-handedly if failure to do so distorts dumping margins. Commerce explains that its "decision not to weight-average the United States sales was reasonable in light of the insignificant number of transactions in the United States."[6]

---

**5.** That provision states in part:

(f) Authority To Use Sampling Techniques and To Disregard Insignificant Adjustments.— For the purpose of determining foreign market value ... the administering authority may—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant

number of adjustments to prices is required, and

(2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

**6.** During the period under review, NAR made 788 sales in the United States. *Defendant's Memorandum* at 59. *Contra Plaintiff's Memo-*

*Defendant's Memorandum* at 59. Since § 1677f–1(a)(1) unambiguously provides that averaging may be used if the number of U.S. sales is "significant," the Court must uphold Commerce's action.

The Court observes however, notwithstanding the uniform applicability of the threshold prerequisites under § 1677f–1, Commerce consistently used a more stringent test in other investigations and reviews in determining whether U.S. sale prices are eligible for averaging. On those occasions, Commerce's rationale for declining to weight-average U.S. sale prices appears to turn on the claimant's inability to substantiate absence of control over the U.S. sale prices. *See e.g., Rock Salt From Canada; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 49,741, 49,743 (Comment 2) (Dec. 4, 1985); *accord Certain Iron Construction Castings From Canada: Final Determination of Sales at Less Than Fair Value,* 51 Fed. Reg. 2,412 (Jan. 16, 1986); *cf. Final Determination of Sales at Less Than Fair Value; Certain Fresh Cut Flowers From Mexico,* 52 Fed.Reg. 6,361 (Mar. 3, 1987); *Final Determination of Sales at Less Than Fair Value; Standard Carnations From Chile,* 52 Fed.Reg. 3,152 (Feb. 2, 1987); *Final Determination of Sales at Less Than Fair Value: Certain Fresh Cut Flowers From Ecuador,* 52 Fed.Reg. 2,128 (Jan. 20, 1987), *aff'd, Floral Trade Council of Davis, California v. United States,* 12 CIT ——, 704 F.Supp. 233 (1988) (weight-averaging the U.S. sale prices proper when unusual price fluctuations are due to the perishability of the merchandise).

To date, the only circumstance under which the U.S. sale prices have been averaged is when the exporters have shown that they have "no control over the prices at which their [merchandise are] sold in the United States." *Rock Salt From Canada* at 49,744. Requests for weight-averaging foreign market sale prices, on the other hand, are granted routinely upon Com-

merce's determinations that the prerequisites stated in the statute have been met.

When Congress amended the 1979 provision to authorize Commerce under § 1677f–1 to average both U.S. price and foreign market value in making comparisons, Congress did not direct Commerce to apply a stricter set of prerequisites when ascertaining the U.S. price. Legislative history discloses that by extending the use of averaging with respect to the U.S. price, the lawmakers wanted to "expand the instances in which the administering authority may use sampling and averaging techniques." H.Rep. No. 725, 98th Cong., 2d Sess. 45, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5127, 5172 (1984). Despite this, it appears that Commerce almost universally averages only the foreign market value. The Court questions whether the impact of Commerce's current averaging policy relieves administrative burden to the extent that it leads to "loss of reasonable fairness in the results." *Id.* at 5173.

## C. *Circumstances of Sales Adjustments to Foreign Market Value*

■ As noted, the law directs Commerce to make adjustments to account for certain cross-market differences when U.S. price and foreign market value are compared. 19 U.S.C. §§ 1677a–1677b; 19 C.F.R. § 353.15. One of the adjustments is for differential amount of commissions paid. 19 C.F.R. § 353.15(b). Section 353.15(c), titled "Special rule," provides that the allowable adjustment is the *lesser* of either the amount of commissions paid or the amount of indirect selling expenses incurred in the market not associated with the commissions. It is undisputed that in making home market sales, NAR incurred commissions whereas none were associated with its U.S. sales. Commerce's action in limiting the adjustment to the amount of indirect selling expenses is thus fully supported by law.

NAR nevertheless contends that such "capping" is inapplicable where "purchase price" is used as the basis for the U.S.

*randum* at 42 (NAR made approximately 100 sales).

price,[7] and insists that it is entitled to a downward adjustment of the foreign market value to the full extent of commissions paid in the home market. NAR's argument that "capping" is limited to situations where exporter's sale price represents the U.S. price appears to stem from a misinterpretation of the regulation and a misreading of *Smith–Corona Group, Consumer Prod. Div., SCM Corp. v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The portion of the "Special rule" relied upon by plaintiff applies only in cases where the *exporter's sale price* is the U.S. price. NAR's claim is necessarily deficient because in this action purchase price, not exporter's sale price, is the U.S. price. In this regard, plaintiff's reliance on *Smith–Corona Group* also fails because that case involved an exporter's sale price situation.

Similarly unpersuasive is NAR's claim for adjustments to the foreign market value for expenses incurred in transporting the merchandise to its end-user customers. A party making a claim to adjustments must submit the substantiating data in a timely manner. *Seattle Marine Fishing Supply Co. v. United States,* 12 CIT ——, 679 F.Supp. 1119 (1988), *appeal docketed,* No. 88–1485 (Fed.Cir. July 1, 1988). NAR not only failed to present satisfactory data but was also two weeks late in submitting such data, fully justifying Commerce's disallowance of the claimed adjustments.

■ Commerce's decision not to make adjustments to the foreign market value for NAR's advertising costs in the home market is also supported by law and the record. Advertising expenses eligible for adjustments are limited to those incurred specifically by claimant in making sales under investigation or review. 19 C.F.R. § 353.15(a). General advertising costs are not eligible for adjustments, unless the claimant satisfactorily establishes that part

of its general promotional efforts featured, or targeted, the merchandise being reviewed or investigated. *See Smith–Corona Group* at 1581. To the extent that NAR admits its "advertising is not designated for specific products but is general trademark advertising that relates to all the company's products," NAR is not entitled to any adjustments. *Defendant's Memorandum* at 56; *Plaintiff's Memorandum* at 37.

### D. *Exchange Rate*

■ As authorized under 19 C.F.R. § 353.56(a), Commerce used the quarterly exchange rates published by the Federal Reserve Board in making the currency conversions for purposes of comparing the U.S. price and foreign market value. If "temporary exchange rate fluctuations" during the relevant period lead to creation of an artificial margin that would not otherwise exist, § 353.56(b), Commerce will apply exchange rates which are tailored to the particular facts of the case. *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 929 (Fed.Cir.1984); *Luciano Pisoni Fabbrica Accessori,* 640 F.Supp. at 260.

NAR does not argue that the exchange rates were volatile during the periods in question. Rather, it contends that even in absence of unusual exchange rate movements Commerce should have applied the exchange rates that NAR used in making currency conversions, namely, the Italian government's official rates. The sole authority NAR furnishes to support its position is the fairness goal behind the U.S. antidumping law.

19 C.F.R. § 353.56 explicitly provides for a detailed procedure that Commerce must follow in making currency conversions. The governing provisions in this area appear to have contemplated the precise argument that NAR now makes and have preempted it. "For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected

---

**7.** The United States price is either the "purchase price" or "exporter's sale price." § 1677a(a). Purchase price is used, as here, when the merchandise is sold to an unrelated U.S. buyer. § 1677a(b). When the exporter and importer are related, on the other hand, exporter's sale price methodology is adopted, and price of a sale to the first unrelated U.S. buyer is used. § 1677a(c).

to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates." § 353.56(b). Doing business in another country is a privilege and accordingly, the participants are expected to establish their business activities in light of the laws of the host countries. NAR's position, which has no basis in law, is an impermissible demand that the Court disregard the U.S. law in favor of the Italian law.

### E. Due Process

■ Until 1984, Commerce was required to conduct an annual review of outstanding dumping duty orders. With a change in the statutory framework in 1984, Commerce's performance of a review became optional, triggered upon request by an interested party. *See* Trade and Tariff Act of 1984, Pub.L. 98–573, § 611(a)(2), 98 Stat. 3031 (1984). The contested review, which was initiated pursuant to NAR's request, covered NAR's entries during a five-year period, prompting NAR to raise a claim of statutory violation during the period when the law prescribed that reviews be executed on an annual basis.

The Court will not rebuke Commerce for a delay caused by the claimant's own conduct. *Cf. UST, Inc. v. United States,* 8 CIT 82, 596 F.Supp. 463 (1984) (directing the administering agency to consider pertinent data belatedly submitted since the delays were not the respondent's fault). The record reveals that NAR was included in Commerce's numerous reviews of the underlying 1979 antidumping order and that its exclusion from these was due solely to NAR's repeated failure to submit appropriate information or to provide them promptly. 48 Fed.Reg. 35,686.

NAR's due process argument also raises the matter of the sufficiency of information it obtained from Commerce in preparation for a disclosure conference held on October 16, 1986, and the adequacy of that meeting. That NAR has a legitimate right of due process is not at issue. The law and the record, however, do not support the allega-

tion of deprivation of the right to obtain information.

19 C.F.R. § 353.53a(c)(6) requires Commerce to disclose and provide to a requesting party "a further explanation of the preliminary results." Commerce supplied NAR with data supporting the preliminary results of the review ten days prior to the disclosure conference. Shortly thereafter, Commerce provided additional supplemental data. *Plaintiff's Memorandum* at 11; *Defendant's Memorandum* at 13. There is no evidence suggesting that the data Commerce provided and the length of the disputed disclosure conference do not meet the requirements of the law or Commerce's practice. Further, a plethora of communications took place between NAR and Commerce throughout the administrative proceedings, rendering suspect NAR's assertion that it did not understand or perceive the actions Commerce took. For the foregoing reasons, the Court finds that NAR was afforded the procedural rights to which it is entitled under the law.

### Conclusion

Upon review of the record submitted, this Court sustains Commerce's findings of facts and law in this action in their entirety. Therefore, plaintiff's motion for judgment on the agency record is denied, and the action is dismissed.

SO ORDERED.