BÖWE PASSAT REINIGUNGS–UND WÄSCHEREITECHNIK GMBH & Boewe–Passat DryCleaning & Laundry Machinery Corporation, Plaintiffs,

v.

UNITED STATES & U.S. Department of Commerce, Defendants.

Slip Op. 96–192.
Court No. 92–01–00058.

United States Court of International Trade.

Dec. 11, 1996.

Barnes, Richardson & Colburn, (Rufus E. Jarman, Jr., Ronald A. Oleynik) for Plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Velta Melnbrencis); Of Counsel, Robert Heilferty, Attorney–Advisor, Office of the Chief Counsel for Import Administration, Department of Commerce, Counsel for Defendants.

## OPINION

POGUE, Judge:

On May 8, 1996, this Court directed Commerce to reconsider its denial of certain level of trade adjustments claimed by plaintiff during the underlying administrative review. *See Böwe Passat Reinigungs–Und Waschereitechnik Gmbh, et al. v. United States,* 926 F.Supp. 1138, 1141–1144 (1996). Familiarity with that decision is presumed.

The statute governing the period of review did not expressly provide for a level of trade adjustment.[1] The adjustment was covered

---

1. The statute has since been amended and now provides for a level of trade adjustment. 19 U.S.C. § 1677b(7)(A) (1994):

Level of trade

The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

by a regulation, 19 C.F.R. § 353.58, which Commerce implemented under its authority to make circumstances of sale adjustments, 19 U.S.C. § 1677b(a)(4)(B) (1988).[2] The regulation stated:

> The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and make appropriate adjustments for differences affecting price comparability.

19 C.F.R. § 353.58 (1989). The statute governing the regulation imposed the burden of supporting a claim for such an adjustment on the party claiming the adjustment. *Sugiyama Chain Co., Ltd. v. United States*, 891 F.Supp. 619, 626 (1995). The statute also vested Commerce with broad discretion to grant or deny the claimed adjustment.[3] *See* 19 U.S.C. § 1677b(a)(4)(B) (1988) (the adjustment must be established *"to the satisfaction of* the administering authority") (emphasis added). Commerce could not exercise this discretion unreasonably or impose impossible burdens of proof on claimants. *See NEC Home Elecs. v. United States*, 54 F.3d 736, 745 (1995) (holding that burden imposed to prove a level of trade adjustment was unreasonable because claimant could, under no practical circumstances, meet the burden); *American Permac, Inc. v. United States*, 12 CIT 1134, 1135–1140, 703 F.Supp. 97, 99–102 (1988); *Silver Reed America, Inc. v. United States*, 12 CIT 910, 915, 699 F.Supp. 291, 295 (1988) ("... ITA's broad discretion to determine whether a factor or condition of sale warrants an adjustment in foreign market value must be exercised reasonably and in a non-arbitrary manner.").

Under the regulation, a respondent with actual sales at two levels of trade in the home market had the best chance of establishing a level of trade adjustment to Commerce's satisfaction. *See, e.g.*, Tapered Roller Bearings and Parts thereof from Japan, 58 Fed.Reg. 64720, 64730 (Dep't Comm.1993) (Final Results Admin.Rev.). The Court noted in *Silver Reed*, however, that such a scenario ordinarily would not require a level of trade adjustment because Commerce would compare those prices made at the same level of trade in the two different markets.[4] *Silver Reed*, 699 F.Supp. at 295.

The more difficult situation, and the one typically in issue before the court, arose when a claimant with sales at one level of trade in the home market and sales at a different level of trade in the United States attempted to convince Commerce to make an adjustment. In those situations, the claimant had to demonstrate that the level of trade adjustment was limited to price differences attributable to different levels of trade, rather than to other factors. Commerce had the difficult task of distinguishing bona fide level of trade differences from actual dumping margins. At the same time, Commerce's grant or denial of the adjustment had to be reasonable and not arbitrary. *See NEC* 54 F.3d at 745.

■ To establish the link between differences in level of trade and differences in

---

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

**2.** The statute in effect at the time provided: "In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to— ... (B) other differences in circumstances of sale; ... then due allowance shall be made therefor." 19 U.S.C. § 1677b(a)(4)(B) (1988).

**3.** Several cases have addressed Commerce's exercise of this discretion. *NEC Home Elecs. v. United States*, 54 F.3d 736, 745 (Fed.Cir.1995); *Sugiyama Chain Co. v. United States*, 891 F.Supp. 619, 625–29 (1995); *NTN Bearing Corp. v. United States*, 905 F.Supp. 1083, 1093–94 (1995); *NAR, S.p.A. v. United States*, 13 CIT 82, 83–86, 707 F.Supp. 553, 556–558 (1989); *American Permac, Inc. v. United States*, 12 CIT 1134, 1135–1140, 703 F.Supp. 97, 99–102 (1988); *Silver Reed America, Inc. v. United States*, 12 CIT 910, 912–915, 699 F.Supp. 291, 293–295 (1988).

**4.** *see* 19 C.F.R. § 353.58.

price, an econometric analysis need not necessarily be performed. *See Daewoo Electronics Co. v. International Union,* 6 F.3d 1511, 1517 (Fed.Cir.1993). Use of cost criteria to satisfy the quantum of evidence required to establish entitlement to an adjustment is permissible. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1577 n. 26 (Fed.Cir.1983). Absent evidence that costs do not reflect value, *id.,* Commerce may presume that costs are passed on to consumers. *See American Alloys Inc., v. United States,* 30 Fed.3d 1469, 1475 (1994). Commerce however, "is not required to assume such a causal relationship." *Mantex Inc. v. United States,* 841 F.Supp. 1290, 1302 (1993).

In the administrative review of the matter at issue here,[5] Commerce acknowledged a difference in the level of trade between plaintiff's home market and the United States by making level of trade adjustments for bad debt and indirect sales office expenses.[6] Commerce, however, denied Böwe's additional claimed level of trade adjustments for advertising, headquarters sales, traffic shipment, legal and finance, and order entry and control expenses.[7]

Böwe contends that its sales in the U.S. were made to distributors at substantial discounts when compared with its home market sales to end users, and that the various functions which a distributor performs account for the difference in price. Commerce disallowed these other level of trade claims because Commerce did not believe the difference in price between home market and export sales to be related to level of trade differences. *Id.* In the first remand, Commerce rejected the claimed adjustments, stating:

In this instance, Böwe sells at the distributor level of trade in the United States and at the end-user level of trade in the home market, *but has no distributor level in the home market.* Böwe has not provided an adequate explanation as to why the claimed expenses would not be incurred if it did sell to distributors in the home market. Rather, they merely attempt to quantify the alleged differences between level of trade.

Remand Determination dated August 5, 1993 in *Böwe–Passat v. United States,* 17 CIT 335 1993 WL 179269 (1993), at 5 (emphasis added) [hereinafter *"Remand I "*]. Commerce also denied the adjustments because Böwe relied on estimations in calculating the claimed adjustments.[8]

The reasons supporting the denial were similar to those addressed by the court in *American Permac, Inc. v. United States,* 12 CIT 1134, 1135–1140, 703 F.Supp. 97, 99–102 (1988). *See Böwe Passat Reinigungs–Und Waschereitechnik Gmbh, et al. v. United States,* 926 F.Supp. 1138, 1141–1144 (CIT 1996). Based on these similarities, and after reviewing the record evidence and the first remand determination, the Court was concerned that Commerce had, as in *American Permac,* imposed an unreasonable burden of proof on the plaintiff. *Id.* The Court found Commerce's insistence on hard numbers rather than estimates to be unreasonable. *Id.*

In the second remand, Commerce stated that certain "gaps and inconsistencies" in Böwe's data prevented the Department from making the claimed adjustments. Commerce stated:

processing of export orders and therefore places a greater burden on its office workers. Böwe's compendium data indicated that its order entry and control employees devoted a much larger portion of their activities to sales in the home market than to sales in the United States. Compendium at 6–23.

---

5. *See* Drycleaning Machinery from Germany, 56 Fed.Reg. 66,838 (Dep't Comm. Dec. 26, 1991) (final results admin. review).

6. Drycleaning Machinery From Germany, 56 Fed.Reg. 38,112, 38,113 (Dep't Comm. Aug. 12, 1991) (prelim. results admin. review).

7. Order entry and control is a translation of the German name given to the department in the home market which handles and processes customer orders. Böwe explained in its questionnaire response that the processing of home market orders is more complicated than the

8. Böwe did not have sales to distributors in the home market and used certain estimated percentages that Böwe believed reflected the difference in price attributable to the difference in the level of trade.

The crux of this issue, then is not that Böwe did not provide actual data relating to Böwe's home market sales at different levels of trade (such data do not exist) but, rather, that Böwe's claims for a level of trade adjustment suffer from gaps and inconsistencies which prevent the Department from relying on these data as the basis for making an adjustment to Foreign Market Value. In sum, the evidence provided to the Department with respect to the alleged differences in selling functions and their attendant expenses is both inconsistent and incomplete.

Redetermination dated July 24, 1996 in *Böwe Passat Reinigungs–Und Waschereitechnik Gmbh v. United States*, 926 F.Supp. 1138 (1996) [hereinafter *"Remand II "*].

Commerce emphasized in its second remand determination that it denied the level of trade adjustments because the "gaps and inconsistencies" in Böwe's data prevented the adjustments, not because Böwe failed to supply data of home market sales to distributors or because Böwe relied on estimations. *Id.* This reasoning cures the otherwise unreasonable burden of proof and leaves only the question of whether there is substantial evidence to support Commerce's conclusion that "gaps and inconsistencies" in Böwe's data precluded the level of trade adjustments.[9]

■ Böwe contends that absent verification, *see* 19 U.S.C. § 1677e (1988), Commerce cannot attack the bona fides of its data, and that accordingly, Commerce must either accept Böwe's data with its concomitant estimations or Commerce must make its own estimations. In short, Böwe contends that Commerce cannot, absent verification, deny the level of trade adjustments on the basis that Böwe's data is unreliable. The Court disagrees. Although Böwe's data stands uncontradicted on the record, Commerce need not conduct verification to conclude that the data is too unreliable to support the claimed adjustments. *See generally, White Glove Building Maintenance, Inc. v. Brennan*, 518 F.2d 1271 (9th Cir.1975) (holding that an agency factfinder may disregard uncontradicted testimony of a witness providing reasons for rejection are sufficiently explained). If Commerce offers adequate reasons that are sufficiently explained, Commerce may reach a contrary conclusion to that urged by the party submitting the data. *Id.* Commerce is not constrained by the inferences Böwe makes from its own data; Commerce may, based on its experience in administering the statute and regulations, make justifiable inferences on the record before it. *See Radio Officers' v. NLRB*, 347 U.S. 17, 48–51, 74 S.Ct. 323, 339–41, 98 L.Ed. 455 (1953); *see also Matsushita Elec. Industrial Co., v. United States*, 3 Fed.Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (reviewing whether "the evidence and *reasonable inferences* from the record support the [ITA] finding.") (emphasis added). The inference in issue here is that gaps and inconsistencies in the data completely undermine the claimed adjustments.

### Advertising

■ The specific inconsistency Commerce identified for Böwe's advertising adjustment involved statements made by Böwe in its case brief and at the Public Hearing. *Remand II* at 10. Böwe stated in its Case Brief, "[d]ue to the nature of the dry cleaning industry, all advertising is directed towards distributors and end users. In all markets, all customers, whether distributors or end users, read the same trade journals and go to the same exhibitions and trade fairs." Case Brief at 10. Similar statements were made at the public hearing, emphasizing that Böwe's advertising in each market is directed

---

**9.** In its brief, defendant argues that plaintiff failed to exhaust its administrative remedies by failing to file substantive comments on Commerce's draft remand redetermination. The Court is unpersuaded that this represents an "appropriate," *see* 28 U.S.C. § 2637(d), scenario to require exhaustion, particularly given that the government's delay in issuing the draft prompted plaintiff to file its substantive comments directly with the Court, in accord with the time periods set forth in the Court's earlier order. Additionally, this case has been remanded more than once on the issue of level of trade adjustments and Commerce's position has not changed; therefore, the Court believes that at this stage of the litigation, any comments by plaintiff would have been futile. Finally, Commerce will have an opportunity to analyze plaintiff's arguments on remand.

at the entire dry cleaning industry, including manufacturers, distributors, and end users of every type. "Transcript of Proceedings," dated October 30, 1991 (Hearing Transcript) at 17 and 18. Given these statements, Commerce concluded that "Böwe's advertising expenses would not differ at all were it to sell to distributors rather than end users in the home market since, under either scenario, the advertising is the same." *Remand II* at 10–11. Accordingly, Commerce stated it could not grant the requested adjustment. *Id.*

If the Court evaluated the evidence on its own, it might conclude that an adjustment of some magnitude was warranted for advertising expense, based principally on the narrative explanation provided by Böwe and the Court's belief that some of the advertising burden borne by Böwe would be shifted to distributors. The Court, however, does not function as a finder of fact in this instance, but evaluates Commerce's decisions to insure that they are supported by substantial evidence. *See* Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(i). The statements Böwe made concerning its advertising indicated to Commerce that Böwe's advertising expenses would be identical, irrespective of the level of trade at which Böwe sells subject merchandise. The statements reasonably support Commerce's conclusion and the Court therefore will affirm Commerce's denial of Böwe's claimed level of trade adjustment for advertising expense.

### Headquarters Sales Department Expenses (HQ Sales)

■ The specific inconsistency Commerce identified for Böwe's headquarters sales department adjustment involved contradictory statements and evidence on the extent to which headquarters sales employees spent time designing dry cleaning shops for end users. *Remand II* at 15–17. Commerce considered Böwe's statement in its Questionnaire Response that "headquarters office has much more work in dealing with the regional sales office or agent than with a sister corporation in another market," and that "[[* * *]] are domestic [[* * *]] *who work with the sales office and customer to lay out*

*dry cleaning shops." Id.* at 15–16 (quoting Questionnaire Response at B–11) (emphasis added). Commerce also considered statements made by Böwe in its Case Brief, in which Böwe repeated its assertion that its employees must spend time assisting end-user customers *in designing the lay-out of their dry cleaning shops. Id.* at 16 (citing Case Brief at 12). Commerce notes that Böwe also stated one page later in its Case Brief that "[h]eadquarters selling personnel *spend most of their time coordinating sales between various customers, potential customers and agents and less time working on the specific details of individual sales."* Case Brief at 13. Commerce inferred that designing the floor plan of a customer's particular dry cleaning shop was intimately tied to "the specific details of individual sales." *Remand II* at 16. This inference suggested to Commerce that Böwe's headquarters sales personnel did not spend "most of their time" designing dry cleaning shops for end users, precisely the work that Böwe claimed would not be performed for sales to distributors and that formed the basis of Böwe's narrative claim for a level of trade adjustment. *Id.*

Commerce's further analysis of Böwe's "Working Time Investigation" for the Headquarters Sales Department, contained in Böwe's October 23, 1991 Compendium, indicated that the activities listed for each employee made no mention of "installation planning" or design of a customer's dry cleaning shop, the two activities Böwe specifically said it could eliminate by selling to distributors in the home market. *Id.* at 17 (citing Compendium at 25 through 34). Given that the record evidence revealed that the headquarters sales staff did not devote most of its time to the specialized end user work forming the heart of Böwe's narrative claim for the adjustment, Commerce concluded that a level of trade adjustment was inappropriate. *Id.* Based on the record evidence, the Court must affirm this determination.

### Traffic and Shipment Department Expenses

■ Commerce explained its denial of Böwe's request for a level of trade adjust-

ment for Traffic and Shipment Department Expenses as follows:

In its *Final Results* the Department classified Böwe's Traffic and Shipment expenses as "overhead," stating that Böwe had "failed to demonstrate that these expenses are sales expenses." *Final Results* at 66839. Our review of the record evidence in this review, including Böwe's Compendium, reaffirms that original determination.

Böwe's March 1, 1991 Questionnaire Response does not include a separate claim for a LOT (or COS) adjustment for Traffic and Shipment expenses, ... In its Case Brief, Böwe makes no mention of a level-of-trade adjustment for Traffic and Shipment expenses. The Compendium for the first time in this review attempts to quantify a LOT adjustment for Traffic and Shipment, and contains information similar to that submitted for the other expenses discussed above, *i.e.*, Böwe's "Working Time Investigation" of Traffic and Shipment employees' activities during one week in September 1991. While this study assists in distinguishing work devoted to the home market, as opposed to export markets, it does not further illuminate the issue raised here: whether, and if so, to what extent, differences in prices are attributable to differences in levels of trade. For example, Employee [[* * *]] activities are listed as "Freight," "Air freight, Express, Courier," "Post" and "Freight, Express, Post." Compendium at 46. Employee [[* * *]], on the other hand, was occupied entirely with preparing orders for dispatch. *Id.* at 47 and 48. Meanwhile, a four-employee team worked on packing and loading dry cleaning machinery. However, Böwe has presented no evidence on the record to support its suggestion that these expenses would vary had Böwe sold to distributors in the home market, except in its assertion that sales to distributors would necessarily involve shipments of more than one unit. *Id.* at 63. While this statement is plausible, Böwe has not explained or quantified the effect this one difference might have on traffic and shipment expenses. Rather, Böwe suggests here, with no further explanation, a LOT adjustment equal to

[[* * *]] percent of its Traffic and Shipment expenses. Böwe has provided no evidence on the record, either in the form of Worksheets or narrative explanation, to substantiate this claim or to explain how it arrived at this [[* * *]] percent figure.

All evidence available on the record indicates that Traffic and Shipment Department expenses were incurred in the general course of business, and bear no relationship, whether direct or indirect, to sales of subject merchandise. Furthermore, even if these could be classified as sales expenses, Böwe has failed to substantiate its claim for a LOT adjustment for these expenses, or to adequately quantify any potential difference which would be attributable to differences in levels of trade. Accordingly, we determine that the Department's original classification of these expenses as "overhead" expenses was correct, given the evidence on the record.

*Remand II* at 18–20 (footnotes omitted).

Commerce has adequately explained the denial of Böwe's requested level of trade adjustment for this expense. Based on the record evidence and Commerce's analysis of the Compendium data, the Court is persuaded that the expenses for the traffic and shipment department were of a general nature, were not true sales expenses, and that Böwe's submission suffered from evidentiary gaps that precluded the adjustment.

### Legal and Finance Department

■ Commerce identified gaps in Böwe's claimed legal department adjustment and inconsistencies in Böwe's request for a finance department adjustment. *Id.* at 20–23. Böwe claimed it would avoid the legal expense of pursuing delinquent accounts by selling to distributors. Commerce concluded that Böwe's claim conflicted with commercial reality. *Id.* at 21. Commerce reasoned that customers at the distributor level are subject to cash-flow problems, as are end users, and require manufacturers such as Böwe to take additional action to secure payment. *Id.* at 21–22. Commerce noted that Böwe simply posited its claim that legal expenses would be eliminated entirely had Böwe sold to distrib-

utors. *Id.* at 22. Commerce also noted that Böwe had failed to indicate whether the claimed adjustment for legal expenses was limited to the department's pursuit of delinquent accounts, as opposed to the department's handling of unrelated corporate legal matters. *Id.* Commerce's explanation of its dissatisfaction with the gaps in Böwe's claim persuades the Court that Commerce's denial of this adjustment was proper.

As to the finance department expenses, Commerce identified both gaps and inconsistencies in Böwe's claim, and, consequently denied the adjustment. *Id.* at 22–23. Commerce considered Böwe's claim that it would not incur expenses relating to invoicing of end-user customers if it sold to distributors. *Id.* at 22. Commerce identified a contradictory statement in Böwe's Compendium that "Böwe would invoice to distributors ...," Compendium at 66, indicating to Commerce that Böwe would incur similar, if not identical, expenses for invoicing its distributor customers, if these existed. *Id.* According to Commerce, Böwe never explained why invoicing expenses would be reduced (or eliminated) for sales to distributors. *Id.* And the contradictory statements made by Böwe led Commerce to conclude that Böwe may have had to invoice its customers regardless of their classification. *Id.* Commerce noted another inconsistency in Böwe's claim: Böwe claimed it would not incur expenses relating to financing of installment contracts for sales to distributors. *Id.* (citing Compendium at 67, and Supplemental Response at Da8). Commerce then identified what it believed to be contradictory record evidence from Böwe's sales to distributors in the United States demonstrating that many of these distributor sales involved extended payment plans similar to those Böwe used for its home market end-user customers. *Id.* (citing Böwe's March 12, 1991 submission (U.S. sales listing)).

The Court is persuaded that Commerce's analysis of Böwe's questionnaire responses and Compendium data justify denial of a level of trade adjustment for Legal and Finance Department Expenses. Commerce was not willing to assume that sales to distributors would involve less legal and finance department work than sales to end users, and the evidence provided by Böwe did not sufficiently detail their home market end-user legal and finance expenses.

### Order Entry and Control

■ Commerce also denied Böwe's request for a level of trade adjustment for order entry and control expenses. *Id.* at 11–15. Böwe contended that it incurred additional expenses in its sales to end users for "administration of commissions, trade-ins, special discounts and financing, special options, scheduling and paperwork as to installation, technical services, official government reporting, etc." *Id.* at 11 (quoting Questionnaire Response at B–11). Böwe further claimed that its sales force spends a disproportionate amount of time (in relation to its total sales of dry cleaning machinery) in processing home market orders directly to end-users in the home market. *Id.* Böwe's compendium data indicated that its order entry and control employees devoted a much larger portion of their activities to sales in the home market than to sales in the United States. Compendium at 6–23.

Commerce made two statements in its redetermination that indicate to the Court that Commerce applied an unreasonable burden of proof in denying the order entry and control adjustment. In the redetermination, Commerce stated "no record evidence exists indicating whether this employee would spend any less time processing orders and technical modifications for sales to domestic distributors." *Remand II* at 14–15. Commerce also stated that "[the Compendium] data provide no information whatsoever relating to differences in OE & C expenses which are attributable to sales at a different level of trade." *Id.* at 13. The Court reads these statements as effectively requiring actual home market distributor sales data from Böwe. The most Böwe can do for the claimed expense is to demonstrate that sales to one level of trade in the home market are more costly than sales to the other level of trade in the United States, and to demonstrate that the cost differential is reflected in price.

Commerce made these statements in explaining that Böwe's order entry and control

data suffered from certain gaps. The actual language from the remand determination reads:

> A thorough examination of Böwe's "Working Time Investigation" sheds no additional light on this issue. This investigation includes, without explanation, "detailed statistics," "inquiries in connection with [[* * *]] sales," "confirmation of [[* * *]]" and other categories of activities as functions it performs for end-user sales which it could avoid by selling to distributors. Böwe makes no attempt to define these activities, let alone to suggest why these activities would be necessary in the case of sales to distributors. For example, the record indicates that Employee [[* * *]] spent a great deal of time working on "Order Processing/Technical Modification," and we can discern from the study how much of this time was spent on domestic orders. Compendium at 7. **However, no record evidence exists indicating whether this employee would spend any less time processing orders and technical modifications for sales to domestic distributors.** Furthermore, such normal business practices as "order processing," "filing letters," "statistics," and "sundry work" (all listed in the "Working Time Investigation") would still be necessary if Böwe decided to make its home market sales to distributors. *Id* at 7 through 9. **Böwe has presented no information to indicate that these functions would differ for distributor sales.**

*Id.* at 14–15 (emphasis added).

Commerce notes that Böwe's Questionnaire Response, Supplemental Response, and Compendium detail the labor expended on home market sales functions; Commerce, however, also opines that Böwe has not produced evidence of non-existent sales to distributors. *Id.* at 14–15.

"[N]o record evidence exists" because no evidence exists at all. Böwe apparently did all it could do to identify the costs of the order and control department and to estimate what portions of those costs would be shifted to distributors in the event sales were made to distributors.

Similarly, in the redetermination, Commerce lists expenses for trade-ins and financing of installment sales as categories for which Böwe has "provided no evidence ... that it would not incur expenses ... if it sold to distributors." *Id.* at 15. That evidence does not exist. Böwe's claims are based on the premise that if Böwe sold to distributors, the distributors would be responsible for any trade-ins, chattel mortgage arrangements, etc.

In effect, Commerce's redetermination imposes the same impossible burden of proof which the Court rejected in its earlier decision. *See Böwe Passat Reinigungs–Und Waschereitechnik Gmbh, et al. v. United States,* 926 F.Supp. 1138, 1141–1144 (1996). By requiring Böwe to produce evidence of non-existent sales to distributors, Commerce is requiring proof of sales when there are none. This unreasonable burden of proof cannot be sustained. *See NEC Home Elecs. v. United States,* 54 F.3d 736, 745 (1995); *American Permac, Inc. v. United States,* 12 CIT 1134, 1135–1140, 703 F.Supp. 97, 99–102 (1988); *Silver Reed America, Inc. v. United States,* 12 CIT 910, 915, 699 F.Supp. 291, 295 (1988).

■ Apart from the application of an unreasonable burden of proof, Commerce attempted to identify inconsistencies in Böwe's claim for the order entry and control adjustment. *Remand II* at 13. After careful consideration of Commerce's explanation of the identified inconsistency, the Court does not believe that it directly undermines Böwe's order entry and control claim. Commerce explained the inconsistency as follows:

> Böwe claims that a price differential arises due to discounts which would be granted on sales to distributors which, Böwe argues, it presently does not grant to end users. Questionnaire Response at A–3. We note, however, that all end-user customers in the home market are entitled to early-payment discounts and "various types of price reductions," and, further, according to Böwe, that home market prices "[[* * *]]." Questionnaire Response at A–2. In other words, Böwe grants discounts as a matter of course at both levels of trade. Likewise, Böwe

claims that it would not incur commission expenses if its home market sales were to distributors. Supplemental Response at D–3. However, the only record evidence the Department has concerning sales of subject merchandise to distributors is that concerning Böwe's own sales to distributors in the United States, which indicates that Böwe did, in fact, incur commission expenses on every sale it made to a distributor. Böwe, therefore, has failed to support its assertions that it incurs additional expenses related to discounts and commissions because it sells to end users, rather than distributors, in the home market.

*Id.*

Prior to this paragraph, Commerce stated that OE & C "essentially involves data entry and processing of orders." *Id.* at 11. Despite the acknowledgment that OE & C is a clerical or administrative function, Commerce, in the above-quoted paragraph, apparently confused the cost of the OE & C administrative expense with the cost of the programs or functions to which it relates; confusion evident, at page 14 of the redetermination where Commerce states that "some of the functions which Böwe suggest lead to different selling expenses due to level of trade (i.e. payment of commissions, discounts, trade-in allowances) are not activities within the purview of Order Entry & Control at all." *Id.* at 14.

Commerce has apparently confused the cost associated with administration of the discounts or commissions, with the cost of the discounts or commissions themselves. Moreover, Commerce's discussion of discounts and commissions does not identify evidence for rejecting the OE & C claim.

Commerce identified from the record that virtually all of Böwe's sales involved discounts. Böwe argues that the mere fact that they give discounts to both distributors and end users does not mean that the administration of the discount and commission programs for the different levels of trade does not entail significantly different costs (and by extension, prices). To paraphrase Böwe's argument, virtually all sales in the dry cleaning industry deviate from "list" prices because of discounts—big, uniform discounts to distributors and a variety of small, sometimes special discounts, to end users. The relevance of this to OE & C is that distributors buy in larger quantities rather than single units. Further, their discounts are single and uniform. Thus, the paperwork is less arduous, time consuming, and labor intensive than the end user discounts. End users typically buy in units of one. Their discounts may involve special arrangements. A similar situation exists respecting commissions.

Therefore, the Court believes that it is not inconsistent for Böwe to have commissions and discounts in both markets, and to have disparate administrative costs pertaining to those sales functions. This is, in fact, what the Compendium data for order entry and control demonstrate. Compendium at 6–23.

The Court directed Commerce to identify, if it could, evidence on the record justifying Commerce's refusal to accept Böwe's estimate of OE & C expenses. In response, Commerce has failed to identify gaps and inconsistencies of any consequence in this part of Böwe's claim. The inconsistencies identified by Commerce concerning discounts and commissions only tangentially concern the administration of those programs, and they do not address the claims supported by Böwe's Compendium data that the administration of home market sales involves higher labor costs than Böwe's sales to distributors in other countries. Accordingly, the Court will again remand this issue to Commerce for reconsideration of its rejection of the claimed order entry and control expense level of trade adjustment.

### ORDER

This case having been submitted for decision and this Court, after due deliberation, having rendered a decision herein; now in accordance with said decision, it is hereby

**ORDERED** that the Department of Commerce's remand redetermination is sustained in part and remanded in part; and it is further

**ORDERED** that this case is remanded to the Department of Commerce to reconsider its denial of level of trade adjustments to foreign market value for order entry and

241

control expenses; and it is further ordered that

**ORDERED** that (1) the Department of Commerce's denial of level of trade adjustments for advertising, headquarters sales, traffic shipment, and legal and finance expenses is sustained; and it is further

**ORDERED** that the remand results are due on **January 15, 1997.** Any comments by plaintiffs are due on **January 29, 1997.** Any rebuttal comments by Commerce are due on **February 7, 1997;** and it is further

**ORDERED** that Commerce's remand redetermination is sustained in all other respects.